## NASHVILLE BREEKO BLOCK & TILE CO. v. HOPTON.—196 S. W. (2d) 1010.

Middle Section.  March 30, 1946.

Petition for Certiorari denied by Supreme Court, October 5, 1946.

398

Armistead, Waller, Davis & Lansden, of Nashville, for complainant.

Bass, Berry & Sims, of Nashville, for defendant.

FELTS, J. Complainant is a corporation engaged in manufacturing building blocks. It was organized by defendant and others and he was a director, vice-president, and, from 1934 to 1942, its general manager in charge of its affairs. Then a group in control dismissed him, and it brought this suit to recover of him for having acted without authority certain sums set out and others to be fixed on an accounting sought. His answer denied he had so acted or was in anywise liable.

After the proof had been taken and at the hearing complainant amended its bill so as to state the exact amounts sued for and to leave out the accounting. He then filed an amended answer and cross-bill setting up additional equitable defenses and asking affirmative relief. The pleadings and the proof made these four main issues:

(1) Complainant alleged he was liable for $4,400 drawn by him as "additional salary"—$2,000 December 31, 1939, and $2,400 December 31, 1941—because these amounts were "bonuses" withdrawn by him without authority and illegally. He averred they were for services rendered complainant by him as its general manager under circumstances making it liable for the reasonable value of such services, which exceeded the amounts paid him and for which he asked recovery.

(2) It sought to charge him for losses in what is called "the house-building venture." In 1941, while the Federal Housing Administration was sponsoring a low-cost housing program, he got it to approve complainant's building blocks for construction of nine model low-cost

houses in different sections of Nashville, and to agree to make mortgage loans on them during the construction. The lots were purchased, some in complainant's name and the others jointly in the names of defendant and the contractors doing the work; complainant furnished its building blocks at cost, or at a discount of 45 per cent of the list price; and under the F.H.A. commitments for loans on them the houses were erected for sale to the public generally.

Complainant alleged that this house-building venture was unauthorized and ultra vires and caused it losses to the amount of $5,596.77—$2,144.39 "actual out-of-pocket loss" and $3,452.38 "discount on the selling price of the building blocks"—and that defendant was liable therefor.

He averred that this enterprise was not ultra vires or unauthorized, but was approved by the directors and undertaken in good faith to advance the interest of complainant, to demonstrate the suitability of its product for low-cost housing, and to open a new market for it in that field; that if it sustained any loss it was because of the unjustifiable action of its directors, after approving the project, in later repudiating it and forcing a sacrifice sale of the houses while some were uncompleted and under construction; and that such action caused him a personal loss of $1,500, for which complainant was liable and for which he asked a recovery.

(3) Complainant claimed he was liable for the sum of $1,725 for use of its office and telephone in his plastering business. He denied he was liable for this.

(4) It sought to recover of him $1,337.53, as the balance due on two accounts on its books, one against him individually and the other against him doing business as Hopton Brothers.

400

The Chancellor held the amounts under item (1) were bonuses withdrawn without authority, and allowed complainant a recovery for the $4,400. In this connection he excluded evidence elicited on cross-examination of complainant's witness Strohm that the amounts paid defendant were reasonable for his services. Under item (2) the Chancellor granted complainant a recovery for $2,902.16, as the loss from the houses jointly in the names of defendant and the contractors, but denied recovery as to the other houses. He also denied recovery on item (3) for rent and telephone. He decreed for complainant on item (4) for $1,310.46 as the balance due by account. He dismissed the cross-bill. The result was a decree for complainant for $8,612.62 and costs.

Defendant appealed and has assigned errors upon the allowances under items (1) and (2), the exclusion of the evidence, and the dismissal of the cross-bill. Complainant has assigned errors upon the disallowances under items (2) and (3). So the respective assignments present here the first three main issues above, with the subordinate ones as to the exclusion of the evidence and the dismissal of the cross-bill.

(1) The Bonuses or Compensation. While a considerable amount of proof was taken, there is very little conflict in the evidence as to the basic facts of this issue. They appear mainly in the uncontradicted statements of defendant and are to some extent reinforced by the admissions of complainant and its witnesses. We summarize them.

Complainant's business was the manufacture and sale of building blocks from cinders and cement. This was a new product in the building industry in this country, which was originated by defendant. A young man with little formal education, he had come from England, and

worked as a journeyman plasterer and later as a plaster contractor. From his father in England he got the idea of developing the business of manufacturing building blocks of cinders and concrete; and he and another young man, Charles W. Akers, an engineer, started this business as a partnership, and later transferred it to a corporation they had formed, the Breeko Concrete Products Company. But neither of them had the capital to exploit the business.

In 1926 they, with others, organized the complainant as a Tennessee corporation. Its authorized capital stock was $20,000, divided into 200 shares of preferred stock of par value of $100 each and 400 shares of common stock of no par value. They interested a number of prominent Nashville business executives in the venture. These gentlemen purchased small amounts, most of them $500 each, of the preferred stock and formed an impressive board of directors headed by J. W. Jakes, who was elected president; defendant was elected vice-president, and Akers secretary and treasurer. One-half, or 200 shares, of the common stock was issued to the purchasers of the 200 shares of preferred stock and the other half was issued to the Breeko Concrete Products Company for the business and the exclusive right to manufacture Breeko blocks in Nashville and surrounding territory.

Complainant erected a plant and began operations; but it spent most of its $20,000 paid in capital for the plant and had very little left for working capital. Its authorized capital was later increased to $30,000, but it succeeded in selling only about $6,000 of this additional stock. Its affairs were managed by defendant and Akers. Handicapped by want of capital, it made small progress and created considerable debts. When the economic de-

pression came in the 1930's, complainant found itself heavily involved and threatened with failure.

In the hope of saving it defendant and Akers sought the aid of its directors, most of whom were heads of large businesses and men of large financial resources. A meeting of the directors was called, and defendant and Akers explained the plight of complainant and asked the directors to pledge their personal credit to enable complainant to borrow money to avert bankruptcy. The Breeko Corporation, successor to Breeko Concrete Products Company, had borrowed $10,000 from the bank on a note endorsed by defendant, Akers, and Mr. Will R. Manier, Jr., and had loaned that money to complainant. Complainant was also heavily indebted to the American National Bank and to other creditors. But nothing was accomplished at this meeting.

There was another meeting of the directors, which was ''a very gloomy meeting.'' Mr. Manier stated he had done all he could, defendant and Akers had exhausted their small credit resources, and they appealed to the other directors to lend their credit to complainant to enable it to continue in business. But these directors said ''they were not willing to put their names on a note, and from the financial statement the company was broke, and the only thing they could see, it would have to go into bankruptcy.'' Defendant expressed the hope that it could survive, and they asked him and Akers to take it over, handle its affairs as they saw fit, and do the best they could to save it; but predicted it would be in bankruptcy within three months. The president, J. W. Jakes, resigned; O'B. Washington was elected but refused to serve; and complainant went for years without a president.

It is true the evidence leaves some uncertainty as to the dates of these meetings. This was doubtless due to the fact that this suit was not brought until some eight or ten years later and the witnesses testified ten or twelve years after these transactions. Also several pages of the corporation's minute book were missing, none of the minutes except those of the organization meeting were ever signed by President Jakes, and the custodian of the minutes, Akers, was not called as a witness. Defendant thought these meetings were in 1932, and stated that one of the directors, Mr. V. S. Tupper, said he would endorse for complainant but next day wrote a letter saying he would not. Mr. Tupper could not recall the meeting or such a letter, but later produced one, which appears to have been dated April 10, 1934.

While defendant seems to have been mistaken as to the dates, the evidence leaves no doubt as to the fact of the meetings; and it shows quit clearly that the directors thought complainant would have to go into bankruptcy, and that they turned it over to defendant and Akers, and asked them to manage it as they saw fit and to do the best they could to save it. Defendant's statements as to these matters are supported by his witness O'B. Washington, and are not contradicted by any of the other directors called as witnesses for complainant. In its answer to the cross-bill, filed after all the proof was taken, complainant made this admission: "It is true that during the depression the directors of respondent, after refusing to endorse personally respondent's note, told Hopton and Akers to do the best they could . . ."

So at the request of the directors defendant and Akers took over the affairs of complainant to try to save it, defendant assuming the general management and Akers taking charge of sales. In an effort to make some arrange-

ment with the creditors, defendant went to the largest creditor, the American National Bank, and was referred to one of the bank's vice-presidents, Mr. George J. Hearn, Jr. He convinced Mr. Hearn that under his management and with the friendly aid of the creditors, complainant might survive, ultimately pay its debts in full, and perhaps make something for its stockholders; and Mr. Hearn entered into his plan, got all the creditors to enter into a stand-by agreement or moratorium, and agreed that from time to time the bank would make new loans in small sums, secured by complainant's accounts and inventory, to enable it to operate under Mr. Hearn's supervision to protect the creditors.

Under this arrangement with Mr. Hearn for the creditors, defendant and Akers managed complainant's affairs from 1934 to 1937. Then Akers left Nashville, his active duties with complainant ceased, and the whole burden of management fell upon defendant. Under the supervision of Mr. Hearn, defendant continued to manage complainant's finances, purchases, production, sales, and all the details of its operations until 1942.

Complainant's by-laws provided the compensation of its officers should be fixed by its board of directors. But during this management the directors never fixed any compensation for defendant or Akers; nor did they attempt to exercise any control over complainant's affairs. They abandoned it to its fate during this critical period through the depression. As stated, Mr. Jakes resigned as president, Mr. Washington was elected but refused to serve, and for some four years there was no president.

Most of the directors were prominent and powerful in business and financial circles. Defendant was anxious for their help not only in complainant's finances but also in its business connections, and he tried to keep alive their

interest in it by keeping them informed, discussing its affairs informally with them, sending them statements of its operations, and getting them to come to directors' meetings when he could, and they seem to have had a few meetings; but all the while they left the entire managment to defendant, and "acceded" to the "dominant position of the bank," as said by Mr. Walter Stokes, one of the directors and one of complainant's witnesses.

During defendant's management there was no fixed salary for him or Akers. But Mr. Hearn allowed them to draw such amounts as complainant was able to pay, considering its condition and the interest of its creditors. In 1934 defendant drew $1,578.83, in 1935 $2,770.29, and in 1936 he and Akers began drawing $300 a month each and continued to draw this amount until Akers left in 1937, ceased to draw any pay, and defendant took over the work of both of them but continued to draw only the $300 per month.

In 1939 complainant had an unusually good year and its affairs improved very much. At the end of the year defendant reviewed its progress and earnings with Mr. Hearn, and Mr. Hearn agreed with him that for his services and the results accomplished he was entitled to $2,000, in addition to the $300 per month he had drawn. This amount of $2,000 was credited to him on the books as "additional salary" for the year, and was later drawn by him. Mr. Hearn also allowed Mr. Strohm, complainant's bookkeeper and assistant manager, $850 additional salary.

To avoid any question by the Government in complainant's income taxes, Mr. Hearn thought it advisable to have a resolution showing approval of these payments by its directors. He had such a resolution drawn and asked Mr. Strohm to have it signed by the directors, stat-

ing they could do so without the formality of a meeting. But when it was presented to Mr. Walter Stokes, one of the directors, he declined to sign it, and gave as his reason that it would have to be brought formally before a meeting. Nothing further was done about it and it was never formally approved by the directors.

In 1940 complainant's business was not so good, it failed to make progress, and defendant did not ask Mr. Hearn for any compensation in addition to the $300 per month. In 1941 complainant had an excellent year and made great progress. When defendant reviewed the business and profits of that year with Mr. Hearn, the latter agreed that for his services and the results accomplished he was entitled to $2,400, in addition to the $300 per month he had drawn. This amount of $2,400 was credited to him as additional salary for the year and drawn by him. Likewise, Mr. Hearn allowed Mr. Strohm $1,500 in addition to the monthly amounts he had drawn.

In May, 1942, as a result of defendant's management under the supervision of Mr. Hearn, complainant's affairs had so improved that its success and prosperity seemed assured. Defendant had brought it through the depression from a virtual bankrupt to a profitable concern. Its plant had been put in first-class condition, some $20,000 had been spent for new equipment, its manufacturing costs had been reduced 25 per cent, its deficit of about $25,000 had been eliminated, and a surplus of approximately that amount created. The net change or betterment in its financial position was about $70,000. The directors' interest revived, Mr. Jakes came back in as president, defendant was dismissed, and two suits brought against him—this one and a companion suit to cancel his stock interest. No question was made as to the additional amounts drawn by Mr. Strohm, and he was

made secretary and treasurer and general manager of complainant.

Whether the case be regarded from the standpoint of complainant's claim to recover the $4,400 as illegally withdrawn, or from that of defendant's claim to that sum as part payment for the reasonable value of his services, the issue is the same: whether on the facts of this case the law raised an obligation upon complainant to pay defendant the reasonable value of his services, and whether such value was equal to or greater than the sum of the payments received by him.

██ The basis of an obligation to pay for personal services must, of course, be a contract, either express or implied. Here there was no express contract; but there was a request of the directors for defendant's services, and upon this request he performed such services, which complainant accepted and greatly benefited thereby. In general, from the mere rendering of services by one and their acceptance by another the law will imply an obligation upon such other to pay the reasonable value of the services, since no one is expected to labor without hire. But there is an exception where the relation of the parties is such that one might reasonably be expected to render services to the other gratuitously, as in the case of members of the same family, or the case of directors of a corporation performing the usual and ordinary duties which are customarily without compensation.

██ Accordingly, directors and officers of a corporation serve without compensation for performing the usual and ordinary duties of their office, and they cannot recover for such services unless compensation therefor has been antecedently and expressly authorized by the charter, by-laws, or a resolution of the board of directors or of the stockholders. 5 Fletcher on Corporations, Perm.

Ed., Secs. 2109-2113; 13 Am. Jur. 974-977. The basis of this rule is that directors are fiduciaries for the stockholders, the interest of directors is such that they are expected to perform their duties as directors gratuitously, and protection of stockholders requires that compensation to directors be strictly limited to what has been previously and expressly authorized.

Under this rule the Chancellor held that the $2,000 and the $2,400 were bonuses illegally withdrawn, because they had not been previously authorized by the directors. Complainant relies upon this rule to sustain the Chancellor's holding; and defendant invokes an exception or another rule which is equally as well established as the former rule.

This latter rule is that a person, although a director or officer of a corporation, or both, may recover the reasonable value of his services to the corporation where they were outside his duties as director or officer and were rendered under such circumstances as fairly indicated that the parties intended and understood that such services were to be paid for, or reasonably ought to have so intended and understood. This rule was applied without discussion in Harris v. Lemming-Harris Agricultural Works, Tenn. Ch. App., 43 S. W. 869, 871. And it was recognized but held not applicable in Reeve v. Harris, Tenn. Ch. App., 50 S. W. 658, 659, where, after discussing the former rule above, Neil, J., stated the latter rule thus:

"But it is also true that a corporate official rendering services to the corporation outside of the scope of his official duty, and not required thereby, may recover compensation therefor upon a promise implied from facts and circumstances, even though he be a director in the corporation. Santa Clara Mining Association v. Meredith, 49 Md. 389, [33 Am. Rep. 264]; 1 Mor. Priv. Corp., Sec. 508;

[Fitzgerald & Mallory] Construction Co. v. Fitzgerald, 137 U. S. 98, 11 S. Ct. 36, [34 L. Ed. 608].''

For various statements and applications of the rule see: Fox v. Arctic Placer Mining & Milling Co., 229 N. Y. 124, 128 N. E. 154, 156; Corinne Mille, Canal & Stock Co. v. Toponce, 152 U. S. 405, 14 S. Ct. 632, 38 L. Ed. 493; Fitzgerald & Mallory Construction Co. v. Fitzgerald, 137 U. S. 98, 111, 11 S. Ct. 36, 34 L. Ed. 608, 613, 614; Church v. Harnit, 6 Cir., 35 F. (2d) 499, 501; Rowland v. Demming Exploration Co., Trustees, 45 Idaho 99, 260 P. 1032; Trust, etc., Bellehurst Syndicate v. Commissioner, 9 Cir., 83 F. (2d) 801; Joy v. Ditto, Inc., 356 Ill. 348, 190 N. E. 671; Stevens v. Industrial Commission, 346 Ill. 495, 179 N. E. 102, 81 A. L. R. 638, 641; United States Cast Iron, etc., Co. v. Henry Vogt Mach Co., 182 Ky. 473, 206 S. W. 806, 813; Johnson v. Tri-Union Oil & Gas Co., 278 Ky. 633, 129 S. W. (2d) 111; Calkins v. Wire Hardware Co., 267 Mass. 52, 165 N. E. 889, 895, 896; 5 Fletcher on Corporations, Perm. Ed., Secs. 2113-2115; 13 Am. Jur. 976-978; Annotation, L. R. A. 1917F, 310, 319-324.

Under these and like authorities, it is quite clear that defendant's services were outside his duties as director or vice-president. Neither the charter nor the by-laws cast any special duties on the vice-president or director. The by-laws merely said that the duties of the officers ''shall be those usual to the office which they fill.'' The usual duties of a president of a corporation are to preside at all meetings, sign certificates of stock, contracts, checks, etc., and the usual duties of a vice-president are to act in the absence of a president. No duty was cast on any individual director as such. The board of directors, *as a body,* were charged with the usual duty of care of the affairs of the corporation, but all the power and duty cast upon them was upon them as a board, and not in-

410

dividually. The usual duties of a director are to attend meetings, act as part of the board, and give advice and counsel to further the interest of the corporation. Corinne Mill, Canal & Stock Co. v. Toponce, supra; Fox v. Artic Placer Mining & Milling Co., supra; Rowland v. Demming Exploration Co., Trustees, supra.

■ Defendant's management of the corporation under the supervision of Mr. Hearn was quite outside the duties of an officer or director of the corporation. Indeed, during this period the functions and duties of the directors and officers were virtually suspended; the directors abandoned the corporation to the management of defendant under Mr. Hearn. "Managerial services rendered by one who is also a vice president and an owner of half the corporate stock of a corporation entitles him to a compensation on an implied obligation. Corinne, etc., Co. v. Toponce, 152 U. S. 405, 14 S. Ct. 632, 38 L. Ed. 493." Trust, etc., Bellehurst Syndicate v. Commissioner, 9 Cir., 83 F. (2d) 801, 803, 804.

■ The evidence leaves no doubt that defendant's services were rendered by him and accepted by the corporation with the intention and expectation that such services were to be paid for, and not rendered gratuitously. None of the directors denied that he was to be paid; and all of them acquiesced in all the payments to him except the one of $2,000 and the other of $2,400. It is true his compensation was not fixed but was contingent on whether the corporation could survive and be able to pay for his services. Clearly, it was contemplated the corporation would, if it could, pay the reasonable value of his services. Under such circumstances the law implied an obligation upon it to do so.

■ Upon the question of the reasonable value of defendant's services, the only evidence was that given by

defendant, that brought out on cross-examination of complainant's witness Strohm, and the other circumstances showing what the services were and the results accomplished. We think it was error to exclude this evidence of the witness Strohm. It was objected to upon the ground that the witness's "opinion is not an issue in this case." But it is now said that he was not properly qualified as an expert to give an opinion as to the value of defendant's services. We think he was. He had been engaged in the building block industry for sixteen years, was familiar with the salaries paid for services similar to those of defendant, and was the secretary and treasurer and general manager of complainant. He said the total amounts drawn by defendant in 1939 and 1941 were in line with the usual and customary compensation paid for such services in the building industry, and were reasonable for the services defendant performed. Defendant's testimony was to like effect.

■ Such amounts certainly seem reasonable, if we look to the results accomplished. It was largely upon this basis and upon the basis of what the corporation could spare, considering the interest of its creditors, that Mr. Hearn allowed the payments to be made to defendant. That is why the additional compensation was allowed for the two particularly prosperous years, 1939 and 1941, and paid in lump sums at the end of those years. But the sum of all the payments to defendant for the years 1934 to about the middle of 1942 was less than $320 a month, about $3,800 a year. This would seem moderate compensation for defendant's services, which resulted in a net improvement of about $70,000 in complainant's affairs. So we think he was entitled to all the sums paid him, including the $4,400 additional compensation, and it was error to hold him liable therefor.

■ (2) The House-Building Venture. Here also there is little conflict in the evidence. Complainant's sales of its building materials had been almost entirely for large and expensive buildings, such as hospitals, hotels, and apartments. But this character of construction practically stopped in the 1930's during and following the depression. Then the Federal Government undertook to stimulate the building of low-cost residences, and created a corporation, the Federal Housing Administration, to finance this housing program by mortgage loans to be handled by F.H.A., building loan associations, and other authorized lending agencies.

So most of the business of the building industry was in this field and not in that in which defendant had found its market. To open a new market for it and enable it to share in this business, defendant began a campaign of advertising in the newspapers, and on billboards, and had made for distribution a booklet, copyrighted in 1938, with pictures and other matter showing the economy and advantages in the use of complainant's building blocks for construction of residences (See Ex. 8 to dep. Hopton).

Under the F.H.A. housing program most of the construction was of wood, which was cheaper than complainant's building blocks, though they were better, safer, and fireproof. But the F.H.A. put the two materials in the same class in its financing of housing. Its experience with some houses constructed of building blocks by a competitor of complainant had led it to disapprove of building blocks for its program. Since most of the building was being financed by loans by F.H.A. and other lending agencies, the public generally would not buy complainant's product because it was not approved by F.H.A.

In an effort to get such approval, defendant enlisted the aid of Mr. Lee, head of the First Federal Loan Com-

pany of Nashville, one of the agencies handling F.H.A. loans; and they went to Memphis to see the officials in charge of F.H.A. for this state. Defendant explained to them that he had investigated the houses which had led to F.H.A.'s disapproval of building blocks, and found the fault was not with the material but in mistakes of construction; and he went into details to convince these officials of the suitability of complainant's product. To demonstrate such suitability, these officials suggested that complainant construct about a dozen low-cost model houses in different sections of Nashville; and they agreed, for the purpose of the project, to approve complainant's product for these houses and to make commitments for loans on them, which commitments could be drawn on to finance the construction.

This was early in 1941, after the directors turned over complainant's affairs to defendant and asked him to manage them as he saw fit to try to save it, and while he was managing it under the supervision of the creditors. He outlined this F.H.A. project to Mr. Hearn and two of the other largest creditors, two of the cement companies; they all approved it and allowed him to proceed with it, which he did. In April, 1941, when he had fairly started this program, before any great loss could have occurred, he got a majority of the directors to come to a meeting. The directors present were O'B. Washington, J. W. Jakes, Frank Gillette, Walter Stokes, Jr., W. O. Tirrell, and defendant himself. He read to them a detailed report of his management for the years 1935 through 1940. He then presented this project to them, the minute entry reciting:

"H. V. Hopton presented a plan to encourage the F.H.A. and other lending agencies of this city who have been opposed to the use of our products in residences. This

plan was to promote the building of a number of residences in various sections of the city to demonstrate the utility of our products. Although this plan was not presented as a motion, it was agreed to by the entire board of directors.'' (P. 60, Minute Book exhibited by Complainant.)

The proof shows that defendant explained this program in detail, told the directors two of the houses were under construction, and offered to take them to see these houses; and that though there was no resolution approving the project the directors actually did approve it and consented to defendant's going forward with it. None of the directors denies this except J. W. Jakes. But he is contradicted not only by this minute recital, written long before there was any idea there would ever be any controversy, but also by defendant and by Mr. Stokes, one of the complainant's witnesses, who said that he thought the plan was a ''right smart idea,'' with ''real possibilities of advancing the interest of the company''; and that ''we (the directors) all had the same general feeling, that it approached a problem along the right lines.''

So defendant went on with this program. He had opened on the books a special account called ''H. V. Hopton—Special Building Account,'' where a record was kept of the items as to each house. He arranged with three different contractors to do the construction. To keep within the cost limits under F.H.A.'s program, he had to figure the building blocks at cost, the cost of manufacture and drayage, or at 55 per cent of the list price. He acquired the lots, taking title to some of them in the name of complainant and the others jointly in the names of himself and the contractor doing the work; and he proceeded to have nine houses constructed for sale, under

F.H.A. commitments for loans on them, by which the construction was financed.

The carrying out of this program took about a year. Defendant sold two or three of these houses prior to his dismissal; and no loss appears to have been sustained on them. In the spring of 1942, after complainant's prosperity was restored and the directors resumed control, this controversy began over this and the other matters herein and the other suit above mentioned. When objection was made about this housing program, defendant asked to be allowed to make a full detailed report. President Jakes at first agreed defendant could do this before a directors' meeting but later told him they had decided they did not want to hear him. They proceeded to liquidate this undertaking, and sold some of the houses in their uncompleted state at sacrifice sales. This seems to have precipitated most of the losses complained of.

We think this undertaking was not *ultra vires*. The purposes of complainant's incorporation were to manufacture concrete products, to install and erect them in buildings, to deal in such products, and in general to do "anything necessary or expedient for the accomplishment of, or incidental to, such purposes." By statute it was authorized to acquire and convey real estate "for corporate purposes" and "to carry on *any* lawful business necessary or incidental to the attainment of the objects of the corporation, whether or not such business is similar in nature to the objects set forth in the certificate of incorporation." Code, Sec. 3722 (4), (13), (Italics ours.)

This house-building program was undertaken to demonstrate the suitability of complainant's product for low-cost houses, and to open up a new market for it in this field. This was incidental to the promotion of complain-

ant's business and the attainment of the objects of its incorporation.

Nor does the proof sustain complainant's other charge, that the project was unauthorized. On the contrary, the proof shows it was authorized. In the first place, it was within the broad authority conferred upon defendant, when the directors turned over the corporate affairs to him, asked him to handle them as he saw fit and to try to save the corporation and their investment. In the second place, in the beginning of the project, complainant explained it at a directors' meeting and they approved it.

So we agree with the learned Chancellor that defendant is not liable for any loss on the houses purchased in complainant's name. The basis of this holding, we understand, was that as to these houses the project was authorized and was undertaken in good faith to advance the interest of complainant. But we cannot agree that defendant should be held for the other houses the title to which had been taken jointly in the names of himself and the contractors.

This part of the project was as much for the interest of complainant as the other part. It was carried on with equal good faith, and handled exactly like the other in all respects save only in the one particular as to the form of taking title. In substance the transactions as to all the houses were the same. The taking of title to some of them jointly in the names of defendant and the contractor seems to have been purely a matter of convenience. The proof negatives any suggestion of any dishonesty, any purpose to convert complainant's property, or any improper motive on the part of defendant in the form of handling these transactions; and we see no ground in

equity for treating them differently from the transactions as to the other houses.

Complainant comments that one of the three contractors constructing these houses was E. J. Hopton, who was a son of defendant engaged in business as a building contractor. There was, however, nothing to indicate he was shown any favoritism, given any advantage, or dealt with differently from the other contractors. It was also made a matter of criticism that one of these houses was sold to a daughter of defendant. But all these houses were built to be sold, and the proof shows that there was no loss on this one.

It is true complainant charged that by furnishing its building blocks at cost for all these houses it lost the profits it would have made if it had sold them at its list price. But it offered no proof to support this charge, or to show it had any market or could have sold these blocks elsewhere if they had not been used for these houses.

(3) The Claims for Rent and Telephone. We think the Chancellor properly denied these claims. Defendant had been engaged as a plaster contractor before the incorporation of complainant, and after that he continued to carry on his plastering business in connection with complainant's business; and he and Akers made an arrangement by which he and complainant shared office expenses. After that, due to the fact that complainant's business had become out of proportion to defendant's business and to the fact that complainant was using his equipment, scaffolding, and tools without charge, he and Akers had terminated this arrangement in 1931, more than ten years before this suit was brought. After 1931 defendant had little plastering business, and complainant's use of his equipment would seem a fair equivalent

of such use as he made of its office and telephone for such business.

(4) The Account. As stated, the Chancellor granted complainant a decree against defendant for $1,310.46, as the balance due on these two accounts. Defendant does not deny this indebtedness. He, however, seeks to offset against it his claim for $1,500, as the personal loss caused him by the wrongful action of complainant's directors in repudiating the housing enterprise and selling some of the houses in their uncompleted state at sacrifice sales. We think the proof fails to support this claim. Defendant did testify that this action of the directors caused him a personal loss and he filed an exhibit with figures totaling $1,780.70, as the loss sustained by him on two of the houses; but he did not state he had put any of his own money in any of the houses, or give any explanation of how the loss could have resulted. So we think this claim of his cross-bill was rightly denied.

It results that the decree of the Chancellor will be modified in the respects above indicated, and a decree will be entered here for complainant against defendant for $1,310.46, with interest since the date of the decree below, and one-fourth of the costs below; three-fourths of the costs below and all of the costs of the appeal are adjudged against complainant inasmuch as practically all the costs were incurred at its instance in the assertion of claims without merit.

Howell and Hickerson, JJ., concur.