Max FREEDMAN and Eulalia Ruth Freedman, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

Eulalia Ruth FREEDMAN, Trustee, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee (three cases).

Nos. 13595–13598.

United States Court of Appeals Sixth Circuit.

April 21, 1959.

Richard Katcher, Cleveland, Ohio; Jerome N. Curtis of Ulmer, Berne, Laronge, Glickman & Curtis, Cleveland, Ohio, on the brief, for appellants.

David O. Walter, Washington, D. C.; Charles K. Rice, Lee A. Jackson, Melva M. Graney, Washington, D. C., Sumner Canary, Cleveland, Ohio, on the brief, for appellee.

Before McALLISTER and MILLER, Circuit Judges, and SHELBOURNE, District Judge.

McALLISTER, Circuit Judge.

The appellant taxpayers paid income taxes on distributions of cash which they received as stockholders in the Cook Products Corporation. They sought to recover the money they had paid for such income taxes in an action in the district court, in which they contended that the distributions to them from the corporation were not taxable, or, in the alternative, if taxable at all, were taxable only as capital gains. The government claimed they were taxable as ordinary income. The district court held that the distributions from the Cook Products Corporation to appellants, as stockholders, were payments of dividends made out of accumulated earnings or profits, and were, therefore, taxable as ordinary income.

The background of the case is as follows: The Cook Coffee Company of Michigan was incorporated in 1921. The Cook Coffee Company of Ohio was incorporated in 1925. These two corporations, hereafter referred to as the Michigan company and the Ohio company, were engaged in the business of door-to-door sale of coffee and other household staples. In 1928, these companies had reached a point where they were unable to expand their operations further by means of their own resources or by what they could obtain through the way of credit. Practically all of the shares of stock in both of these companies was owned by Max Freedman and H. C. Broder. Considering that it was vital to expand the operations of the companies, they opened negotiations with J. Aron & Company, of New York, a large importer and dealer in coffee. The Aron Company was interested in a rapid, forced expansion of the Michigan company and the Ohio company, in order to provide additional outlets for the sale of its coffee. It was therefore, agreed that a parent corporation, Cook Products Company, be formed, and that, in return for all of the stock of the Michigan company and the Ohio company and $500,000 paid in by the Aron Company, 15,000 shares of nonpar value common stock would be issued, of which 5,000 shares were to go to Aron, 4,900 shares to Freedman, 4,900 shares to Broder, and 200 shares to M. J. Kalasinski. This agreement was carried out; the Cook Products Corporation, hereinafter called "Products," was formed; and its stock was issued in the amounts above mentioned.

As heretofore stated, the business involved in this case consists of door-to-door sale of coffee and other staples, along established routes. It appears that a successful "wagon route" requires about 400 to 500 customers, who are called on every two weeks. An established route brought in a profit to the company of about $1,000 a year. In order to get a route established in 1929–1933, the period here involved, it took an expenditure of about $4,000 a route, and required three or four months of work. The procedure in establishing a route is, first, to make a survey of the town and neighborhood to determine the type of population and the prospects for a stable business. Thereafter, solicitors are sent out to meet the housewives and to induce them to take a premium, which will be paid for by credits as they purchase the company's products. After the route is established, it is turned

over to drivers, or salesmen, but with a resolicitation to pick up customers lost on the transfer. Among the costs, then, of establising a route, are the surveys, the training and employment of solicitors, the training of salemen, the original purchase of trucks, and, in the case of expansion, the acquiring of branch warehouses.

When Products was organized, the preexisting profits of the subsidiaries, the Michigan company and the Ohio company, were thereupon carried on its books as an account receivable. These operated to increase the surplus of Products, then the parent of the Michigan company and the Ohio company. The pre-existing losses of these two companies were carried on the Products company's books as an account payable. This account payable operated to decrease the Products company's earnings and profits.

During the three years following the organization of the parent corporation, the business expanded—as was the objective of the new financing and the formation of the Products company. The profits of the Michigan company and the Ohio company continued to be carried as an account receivable, and the losses, as an account payable. Products company advanced funds to the two subsidiary companies, and these advances were carried on Products' books as accounts receivable. Payments were made from time to time by the subsidiaries to Products, and such payments were credited on Products' accounts receivable. Later, through reorganization, the accounts receivable on Products' books were paid in full.

The losses [1] of the two subsidiaries, as mentioned above, were carried as accounts payable by Products. In effect, such losses were absorbed by Products and were not repaid by the subsidiaries. These losses by the subsidiaries were considered as the obligation of the parent corporation, Products. It is the treatment, by the Commissioner and by the district court, of the losses of the subsidiaries, which were absorbed by the parent, Products,—and considered as the obligation of Products,—that gives rise to the sole issue in this case.

When the parent corporation deducted the amounts advanced to the subsidiaries as expenses of doing business or as loans, the accumulated earnings and profits of the parent corporation, as thus reported, were insufficient to take care of its distribution to stockholders, here in question. If such advances were properly deducted, then the distribution by the parent corporation to its stockholders was not a dividend out of earnings and profits taxable as ordinary income for the reason that, at the time of the distribution, there would be insufficient earnings and profits to cover such a distribution.

The Commissioner refused to allow such advances to be deducted by Products, as loans or expenses, on the theory that these advances constituted a capital investment, and that, in making such capital investment, no loss was incurred by the parent corporation. If such advances made by Products were not properly deducted as loans or expenses, there were sufficient earnings or profits to cover the distribution to the stockholders—which, in such case, would be a dividend out of earnings and profits, and, as such, result in the receipt of ordinary income to the stockholders.

The issue is whether the losses—that is, the money advanced by the parent corporation to the subsidiaries, and used up by them in expanding the business—could have been availed of by the parent corporation as a loss deduction which reduced the parent's earnings and profits. If the losses, or advances, could be so deducted by Products, the distribution made by Products to its stockholders, over and above its earnings and profits, was tax free; and this is the contention of the taxpayers in this case. The government contends that the payment by Products of the subsidiaries' losses was a

---

1. The losses consisted of the funds advanced by the parent corporation which were used up by the subsidiaries in expanding the business.

capital investment and did not reduce the parent corporation's earnings and profits; and that, accordingly, the distributions made to appellants were dividends from earnings and profits and properly taxable as ordinary income.

It should here be remarked that the record is somewhat confusing as to the advances, or contributions, made by the parent corporation to the subsidiaries. It appears, however, that there were two kinds of advances from the parent to the subsidiaries: (1) advances made as loans, which were used in the operation of the business of the subsidiaries and reflected in open accounts; and (2) advances made for the expansion of the business of the subsidiaries and, as a result, for the expansion of the business of the parent. This case does not involve the advances made as loans reflected in open accounts, and we need not be concerned with them. The other advances, made by the parent corporation, for the expansion of the business, are the only advances or contributions that this case is concerned with.

■ We start, then, as did Judge Weick, in his able opinion, with the proposition that it is settled law, for tax purposes, that parent and wholly owned subsidiary corporations are not identical but are treated as separate entities, no matter how closely they are affiliated. National Carbide Corp. v. Commissioner, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779.

In the case of a parent and subsidiary corporations, where the earnings of the subsidiaries are transferred to the parent, resulting in profit to the parent, why, it is asked, may not the losses of the subsidiaries be transferred to the parent and be deducted by it as expenses? It would seem plausible, under such circumstances, to treat the parent corporation and its subsidiary corporations as a single corporate entity, so that the losses of the subsidiaries might be deducted from the earnings and profits of the parent. But it is firmly established that, for tax purposes, the separate corporate entities may not be disregarded.

■ In National Carbide Corp. v. Commissioner, supra, the taxpayer sought to have the income of the subsidiary treated as the income of the parent, but this was denied. In Interstate Transit Lines v. Commissioner, 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607, instead of attempting to have the income of a subsidiary treated as the income of the parent, as in National Carbide Corp. v. Commissioner, supra, it was attempted to transfer the losses of the subsidiary to the parent and have them deducted as expenses of the parent. But the court refused to permit such deductions as expenses of the parent on the ground that the operating deficit of the subsidiary was not an expense of the parent's business. In other words, the losses incurred by a subsidiary in doing business are not to be considered as losses of a parent in doing business, where the parent corporation is only a holding company. In cases involving the deductibility, during the taxable year, of current losses, it is held that payments by a parent corporation to its subsidiaries, to cover the latter's losses, are either loans or capital contributions, and the subsidiary may not shift its losses, for tax purposes, to the parent corporation. Esmond Mills v. Commissioner, 1 Cir., 132 F.2d 753. Furthermore, where the issue is whether losses of a subsidiary may be deducted from earnings and profits of the parent, in the case of a later distribution by the parent corporation to its stockholders, so as to result in a return of capital to them, it is held that such a distribution is not a return of capital but a dividend. Commissioner of Internal Revenue v. Phipps, 336 U.S. 410, 69 S.Ct. 616, 93 L.Ed. 771. If a subsidiary has a surplus in earnings and profits, the parent has a choice of two methods by which it may realize the surplus: (1) it may cause the subsidiary to declare a dividend; or (2) it may liquidate its interest in the subsidiary. But there is no way to declare a deficit, and, thus, no method, open to the parent, of realizing a loss, parallel to a declaration of dividends, as a mode of realizing the profits of the subsidiary. Commissioner

of Internal Revenue v. Phipps, supra. In answer to the contention, implicit in appellants' argument, that the deficits of subsidiaries should be subtracted from the earnings and profits of a parent in order to make the tax consequences of the liquidation correspond with corporate accounting practice, the rule, as applied to earnings and profits, is not controlled by ordinary accounting concepts. Assets which are properly considered capital for many, if not most, corporate purposes, are often treated as earnings and profits for tax purposes; and it is a commonplace of tax law that such divergences frequently occur, ibid. Commercial accounting and tax accounting are not always the same. Guardian Investment Corp. v. Phinney, 5 Cir., 253 F.2d 326. Since a subsidiary's deficit cannot be transferred to the parent so as to reduce the latter's earnings and profits by means of a reorganization, the deficit cannot be transferred to reach the same result, by means of a contract or by a corporate resolution providing for such a transfer of a loss.

Appellant taxpayers rely upon the decisions in two cases by the Tax Court to sustain their contention that losses of subsidiaries are properly deductible as expenses of the parent corporation. In one of these, Fishing Tackle Products Co. v. Commissioner, 27 T.C. 638, the parent corporation assumed that the losses of the subsidiary would be chronic, in spite of the fact that it was adequately capitalized. The parent, in carrying on its own business, needed the products of the subsidiary, which was its only source of certain goods without which the parent would be unable to meet a number of demands of its customers and its position in the industry would have suffered. The payments made by the parent in that case were made to maintain and preserve its source of supply, and were clearly a business necessity. In securing these products and goods of the subsidiary for the benefit of the parent's business operation, it was reasonable to consider the losses arising from the business operations of the subsidiary to be expenses in-

curred in the carrying on of the business of the parent. In Chicago Pneumatic Tool Co. v. Commissioner, 21 B.T.A. 569, credits by the parent to one of its subsidiaries were held to be a deductible loss, because of the fact that the payment was made by the parent for its own business purposes, and on account of its own business necessities. In both of these cases, it may be said that the expenditure of the parent corporation was an expense of carrying on its own business.

The foregoing cases are distinguishable from the instant case. Here, the parent corporation was a holding company. The Aron Company had invested $500,000 in the parent company, Cook Products Corporation. In turn, Cook Products Corporation contributed that sum of $500,000 to the subsidiaries to defray the costs of establishing new routes. Advances from a parent corporation to, or on behalf of, its subsidiaries must be either capital contributions, gifts, loans, or, in some cases, expenses. "A corporation must derive its funds from three sources: capital contributions, loans, and profits from operations." National Carbide Corp. v. Commissioner, 336 U.S. 422, 434, 435, 69 S.Ct. 726, 733, 93 L.Ed. 779. There is no contention in this case that the advances from the parent corporation to the subsidiaries were gifts; nor were they profits from the operation of the business of the subsidiaries. It was not intended that the advances would ever be repaid by the subsidiaries, and therefore, it would seem that they could not be considered loans—and the district court, in its opinion, stated that the taxpayers did not contend that they represented loans.

If the advances in question from the parent corporation to the subsidiaries did not constitute a loan or a gift, and if they were not expenses of doing business of the parent corporation, there appears only one classification in which such advances could fall—a capital investment on the part of the parent corporation. If the advances from a parent corporation constituted a capital investment, then the Commissioner and the district court were right in disallowing the deduction of such

advances from the parent's surplus, and, accordingly, as far as this case is concerned, the distribution made by the parent corporation to its stockholders was a distribution taxable as ordinary income. It is conceded by appellants that if the advances in question made by the parent corporation to its subsidiaries constituted a capital investment, then the distribution of funds made by the parent corporation to its stockholders was taxable to them as ordinary income.

However, in their reply brief, appellants do now contend that such advances were loans. In reply to the government's claim that the advances by the parent corporation to the subsidiary constituted a capital investment and did not diminish its assets, but, rather, resulted in an increase in the value of the capital investment, appellants submit an outline of what happens when a parent corporation advances cash to a subsidiary which suffers a loss in the amount of the cash so advanced. They contend that instead of the assets of the parent corporation being augmented in such a case, the parent's assets are decreased. This is so, of course, in ordinary business operations. But the crucial point in this case is not that the parent corporation advanced cash to a subsidiary, which it promptly lost, but that the parent corporation, by its advances to the subsidiaries, under the particular circumstances of this case, was making a capital investment—and this is proved by the following facts: The whole purpose of securing the $500,-000 investment from J. Aron & Company was to expand the business of the Michigan company and the Ohio company. The stockholders of those companies had come to the conclusion that it was vital to expand. J. Aron & Company, in making the investment of $500,000, was not concerned with the continuance of the business as theretofore carried on, but with a great expansion, so that additional outlets would be provided for the sale of its coffee.

As soon as the new corporation was organized with Aron's money and the total stock of the two old companies, a rapid, forced expansion was carried on, in which the wagon routes were increased from 110 to three times that number, and two additional subsidiaries were acquired. In 1933, it was concluded by the stockholders of the parent company that the program had been carried out and should be terminated. When the program of expansion ended, the result was that a large corporate business had been created by reason of the advances of money by the parent corporation to the subsidiaries. This was what the parent corporation intended to buy, and did buy, with the money it paid out. The Aron Company and the stockholders of the old corporations prior to the organization of the new parent company did not intend to pay out upwards of $500,000 as expenses of doing business for a three-year period, either on behalf of the subsidiaries or on behalf of the parent itself. They intended, by this large expenditure, to augment and expand the business theretofore carried on to three times its size; and they did so. In effect, with these advances to the subsidiaries, they bought a big business. It was the purchase of something in the nature of an entity rather than disbursements for a multitude of miscellaneous expenses. It is to be recalled that when one of the appellants in this case, who was one of the two main stockholders in the Michigan company and the Ohio company, was trying to expand the business, he was interested, according to his testimony, in finding someone to invest money in order to expand; and it was the Aron Company that made such an investment, and the amount so invested achieved that expansion.

It does not matter what the advances were called or how denominated by the parent or the subsidiaries. The fact that the books did not reflect these advances as a capital investment is not important. The parent company actually received what it had paid its money for—a greatly expanded business. As to the parent corporation, its advances clearly constituted a capital investment.

In sum, the advances of the parent corporation to its subsidiaries constituted a capital investment; they did not decrease the corporation's earnings and profits available for dividends; and the distribution by the parent corporation to its stockholders was not a return of capital but a dividend from earnings and profits and, hence, subject to taxation as ordinary income.

Some question was raised on the trial by the government as to the admissibility of parol evidence to prove certain stipulations in addition to those contained in a written contract. The district court assumed that such evidence was admissible, a holding which was favorable to appellants, and, accordingly no error can be assigned by them, in this regard.

In accordance with the foregoing, the judgment of the district court is affirmed.