E. Ward KING and Myrtle C. King et al., Petitioner-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 71–1418.

United States Court of Appeals, Sixth Circuit.

April 7, 1972.

John Y. Merrell, Annandale, Va., for appellants; Edwin O. Norris, Hunter, Smith, Davis, Norris, Waddey & Treadway, Kingsport, Tenn., on brief.

Richard Farber, Tax Div., Dept. of Justice, Washington, D. C., for appellee; Fred B. Ugast, Acting Asst. Atty. Gen., Meyer Rothwacks, Harry Baum, Attys., Tax Div., Dept. of Justice, Washington, D. C., on brief.

Before PHILLIPS, Chief Judge, and PECK and McCREE, Circuit Judges.

PECK, Circuit Judge.

This case involves the income tax liability for the year 1963 of the stockholders of the Mason & Dixon Lines, Inc., a motor common carrier of freight in interstate commerce. The facts of the case are fully set forth in the reported decision of the Tax Court, 55 T.C. 677, and disclose that Mason & Dixon, a Tennessee corporation formed in 1934, had been expanding rapidly since 1945 and by 1950 had outgrown its existing terminal facilities. It became apparent that new terminals would have to be constructed. The Interstate Commerce Act prohibited Mason & Dixon from borrowing the substantial funds it needed without prior ICC approval, a complex and extended procedure. Subsidiary corporations were therefore formed which were not subject to the jurisdiction of the ICC for the purpose of acquiring, improving, and leasing real estate to Mason & Dixon. The three subsidiary corporations involved in this action are Interstate Investment Corp., formed in 1950, Motorways Investment Corp., formed in 1953, and The Regal Corp., formed in 1956. Mason & Dixon owned all outstanding stock until October 4, 1963.

These corporations each served the same function, and each conducted its affairs in an identical manner. As Mason & Dixon required additional facilities, one of the subsidiary corporations would acquire the land, would accept a bid and enter into a contract with a general contractor for the construction of the terminal. In each case, the architect was engaged by Mason & Dixon. The subsidiary corporation would obtain a permanent loan secured by a first mortgage real estate note or a deed of trust to secure the debt on which it was the sole party obligor. Upon completion of the terminal, it was leased to Mason & Dixon.

In 1963, in order to facilitate a merger with Silver Fleet, Inc., an Indiana common carrier of freight, Mason & Dixon reorganized its operations to consolidate all carrier corporations in one group and all non-carrier corporations in another. This was accomplished by distributing all the stock of the three leasing corporations to the stockholders of Mason & Dixon, who then transferred all of this stock to Crown Enterprises, Inc. in exchange for voting stock of Crown, a wholly owned subsidiary of Mason & Dixon which had been formed in 1957 for the purpose of renting automotive equipment. The result of this distribution and exchange was that each of the three leasing corporations now enjoyed greater borrowing power by virtue of the fact that the common parent, Crown, could negotiate for all. The leasing corporations continued to operate in the same fashion as they had prior to the reorganization.

The stockholders reported this receipt of stock in their respective 1963 income tax returns as a transaction in which no gain or loss is recognized under § 355 of the Internal Revenue Code of 1954. The Commissioner determined that this distribution constituted a taxable dividend to the extent of the fair market value of the stock received by each taxpayer, and denied the claimed non-recognition of

the distribution. The Tax Court sustained the Commissioner and concluded that the three subsidiary corporations were not engaged in the active conduct of a trade or business for the five year period prior to the date of the distribution, as required by § 355(b). Having so held, the Tax Court found it unnecessary to reach the Commissioner's alternative arguments that the subsidiaries were not engaged in the active conduct of a business immediately after the distribution and that the transaction had been used principally as a device for the distribution of the earnings and profits of the subsidiaries.[1] The taxpayers have perfected this appeal from the decision of the Tax Court.

■ Section 355 of the Internal Revenue Code of 1954 provides an exception to the general rule that stock distributions by corporations are taxable to the shareholders. Distributions are so taxed to prevent corporations from moving undistributed income and earnings into the hands of stockholders who can dispose of them at capital gain rates instead of ordinary income rates. Congress recognized that there may be valid business reasons for the distribution of stock, and therefore provided that a distribution may go untaxed if the requirements of § 355 are met.

We start with the findings of the Tax Court that the subsidiary corporations were not shams, that there was no subterfuge, that the leasing corporations were organized to fulfill a valid business need of Mason & Dixon, that the leasing corporations adopted and followed the most advantageous method of doing business, that all rentals paid were customary within the industry and that the stock distribution and reorganization were also entered into for valid business reasons. The record shows that the subsidiary corporations performed all activities necessary to the operation of the real estate leasing business. Each subsidiary purchased land, negotiated with

contractors for the construction of terminals, obtained loans, arranged for mortgages in favor of the lender, obtained insurance on the facilities, leased the terminals to Mason & Dixon, collected rentals, made payments of principal and negotiated for additions and alterations to terminals whenever necessary. In performing these and other functions, the subsidiaries acted and were dealt with as independent corporate entities by Mason & Dixon, as well as by contractors and subcontractors, bonding and insurance companies, bankers and other financial institutions, attorneys and local, state and Federal governmental agencies, including the Interstate Commerce Commission and the Internal Revenue Service.

■ Nevertheless, the Tax Court concluded that the subsidiaries had not actively conducted a trade or business because they performed these activities "in name only," principally because the officers of the subsidiary corporations were also officers of Mason & Dixon, and when these men acquired property, arranged financing and constructed the terminals they were acting on the ultimate behalf of Mason & Dixon. This conclusion was based upon the interdependence between Mason & Dixon and its subsidiaries, and we hold this conclusion to be violative of the principle that, especially for tax purposes, separate corporations, even parent and wholly owned subsidiary, must be treated as separate entities, no matter how closely they may be affiliated. The separate corporate entity may not be disregarded. Freedman v. United States, 266 F.2d 291 (6th Cir. 1959). In Taylor v. Commissioner of Internal Revenue, 445 F.2d 455 (1st Cir. 1971), the First Circuit said:

"Although federal courts have, on occasion upheld the Commissioner's disregard of a corporate entity, this has generally been done to prevent unfair tax avoidance. Only in situations where a corporation performs no func-

---

1. The other requirements of § 355 are not in issue; nor is any question raised as to the active conduct of a trade or business by Mason & Dixon.

tion but the holding of title to real estate, have courts ignored the corporate entity." 445 F.2d at 457.

It is clear from the Tax Court's opinion that it disregarded the separate entities of the subsidiary corporations and based its conclusion upon the relationship of the subsidiary corporations to the distributing corporation. The record in this case discloses that the subsidiary corporations did far more than merely hold title to the terminal facilities which were leased to Mason & Dixon. In short, the record shows that the leasing corporations engaged repeatedly in construction projects of considerable magnitude, created substantial income producing rental properties and conducted all activities essential to the real estate leasing business. Even though the officers and directors of the leasing corporations were also officers and directors of Mason & Dixon, when they were performing activities in behalf of the leasing corporations they were in fact and in law acting solely for the leasing corporations.

The Tax Court considered that the fact that the leasing corporations had but one paid employee, an accountant, indicated strongly that no activities were being performed by the subsidiaries. However, the record clearly establishes that each subsidiary had four officers and at least four directors, all of whom rendered substantial services in acting for the subsidiaries.[2]

The Tax Court found that the net lease basis upon which properties were leased to Mason & Dixon represented pure passive income without the concomitant expenditure of money or effort on the part of the lessor. However, the Tax Court also found that the net leases represented the most advantageous method of doing business from the point of view of the leasing corporations, that the leases were bona-fide and of a type customarily used in the industry in long term situations and that the rentals paid were customary in the industry. The leasing of the terminal facilities represented the ultimate objective of the subsidiary corporations, but, as detailed above, it was far from the only activity conducted by them.

The findings of the Tax Court refute any contention that the subsidiaries were sham corporations or were mere contrivances for transferring corporate profits and properties. These corporations were not created to transfer corporate shares or anything of value to the taxpayers, were not terminated when their limited function had been exercised (as in Gregory v. Helvering, Commissioner of Internal Revenue, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935)) nor were they formed for the specific purpose of distributing stock upon the expiration of the five year period (as in Rafferty v. Commissioner, 452 F.2d 767 (1st Cir. 1972), hereinafter discussed.)

In direct contrast, these subsidiaries were formed for valid business reasons many years before the transactions in question were contemplated. The distribution of their stock was not even considered until after the Silver Fleet transaction created new business needs for the group (and even then, only after it became necessary to abandon another plan, which would not have involved such a distribution). All transactions, from the formation of the subsidiary corporations to the contested distributions, even to the present operation of the corporations, were designed to conform to ICC regulations. It seems clear that this is exactly the situation intended to be protected by § 355.

The Senate Finance Committee Report states with reference to § 355:

"Thus, your committee would liberalize present law with respect to the nonrecognition of gain or loss in cases

---

2. Although they were not paid for these services, it is customary that officers and directors serve without compensation unless special provisions have been made. E. g.: Nichols-Morris Corp. v. Morris, 174 F.Supp. 691, 698 (S.D.N.Y.), appeal dismissed, 272 F.2d 586 (2d Cir. 1959), Nashville Breeko Block & Tile Co. v. Hopton, 29 Tenn.App. 394, 196 S.W.2d 1010 (1946).

which involve *mere rearrangements* of the corporate structure." S.Rept. No. 1622, 83 Cong., 2d Sess. p. 50, U.S. Code Cong. & Admin.News 1954, p. 4673. (Emphasis added.)

And Treasury Regulations, § 1.355–2(c) provide that § 355 is to be applied to distributions of the stock or securities of controlled corporations incident:

". . . to such readjustment of corporate structures as is required by business exigencies and which, in general, effect only a readjustment of continuing interests in property under modified corporate forms."

This is precisely what was done in the present case. We can only conclude that the appellants are not attempting to avoid taxation, but only seek tax postponement on unrealized gains in a manner authorized by statute.

The Commissioner contends that the case is governed by Treasury Regulation 1.355–1(c). This regulation provides that a group of activities do not satisfy the active business requirement of § 355 if they are not "independently producing income," even though they may be part of a business operated for a profit. We agree with the First Circuit, which noted in *Rafferty* that these portions of the regulations are so broadly drawn that they may be used in some cases to defeat the clear legislative intent. Furthermore:

"The correctness of these regulations is questionable in view of the rejection of the separate business requirement of § 1.355–1(a) in United States v. Marett, 325 F.2d 28 (5th Cir. 1963) and Coady v. Commissioner of Internal Revenue, [33 T.C. 771 (1960), aff'd., 289 F.2d 490 (6th Cir. 1961)]." Rafferty v. Commissioner of Internal Revenue, *supra.*

We decline to rest our determination upon these imprecise regulations, and instead rely upon the language of the statute itself and its legislative history. This conclusion makes it unnecessary to pass upon the applicability of the regulations to the factual situation here

present, but we express some reservation in this regard.

The Tax Court did not reach the Commissioner's alternative issues concerning the other requirements of § 355, and the Commissioner's brief suggests that in the event of a reversal the case should be remanded to the Tax Court for further findings on these issues. However, a remand is unnecessary if all the evidence is documentary and the appellate court can pass upon the facts as well as the trial court, or if all the facts relied upon to support the judgment are in the record and are undisputed, or if the record as a whole presents no genuine issue as to any material fact. E. g.: Texas Co. v. R. O'Brien & Co., 242 F.2d 526 (1st Cir. 1957), Hazeltine Research v. General Motors Corp., 170 F.2d 6 (6th Cir. 1948), McComb v. Utica Knitting Co., 164 F.2d 670 (2d Cir. 1947), Aetna Life Ins. Co. v. Meyn, 134 F.2d 246 (8th Cir. 1943). In considering certain § 355 questions, the Supreme Court stated: "[s]ince the record leaves no disputed issue of fact with respect to this question, we find it proper to decide it here without reference to a tryer of fact." Commissioner v. Gordon, 391 U.S. 83, 95 n. 8, 88 S.Ct. 1517, 1524, 20 L.Ed.2d 448 (1968).

The Tax Court decided the issue of whether the subsidiary corporations were engaged in the active conduct of a trade or business immediately after the distribution when it found that "[a]fter the transactions described above, Interstate, Motorways and Regal carried on in the same fashion as they had theretofore." Since we have determined that the leasing corporations were engaged in the active conduct of a trade or business for five years prior to the distribution, it follows that they were so engaged immediately after the distribution.

The only question remaining to be decided is whether the distribution was used "principally as a device" to distribute the earnings and profits of the subsidiary corporations. We think that the findings of the Tax Court clearly indicate that it was not, and consequently a

remand for further deliberation on this point would serve only to unduly protract this litigation.

The Tax Court found that all transactions involved were motivated by valid business reasons. If any change occurred in the tax status, it was simply an incidental result and not a motivating purpose. Furthermore, the distribution could not have been used as a device because the plan of distribution required that the stock received be exchanged immediately for the stock of Crown. Thus the distributed stocks were locked into Crown after the transaction as securely as they had been locked into Mason & Dixon beforehand, and the stockholders were as far removed from the earnings and profits after the distribution as they had been before, and could not abstract any accumulated earnings at capital gain rates.

This purpose is demonstrated also by the exchange of M. & D. Investment stock for stock of Crown. The controlling stockholders already held this stock directly and were entitled to capital gain treatment on a sale of this stock or a liquidation of the corporation. The fact that they put these earnings and profits out of their reach as part of the transaction here in question shows clearly that their purpose was to build a strong corporate group, not to receive corporate earnings and profits. The deficiencies assessed by the Commissioner result from a transaction in which the taxpayers received no cash or cash equivalent with which to pay the tax. Thus, the Commissioner is attempting to tax a gain which has not yet been realized.

In this regard, this case is readily distinguishable from Rafferty v. Commissioner of Internal Revenue, *supra,* in which the First Circuit found that the distribution had been used principally as a device for the distribution of earnings and profits because the motive for the creation of the subsidiary corporation and eventual spin-off was an estate planning motive. The Court reasoned that this in itself does not disqualify the spin-off, but absent a showing that these personal motives were germane to the continuance of the corporate business, such motives were not sufficient to permit non-recognition of the spin-off under § 355(a) (1). The Court noted that these personal motives could have been served equally well by a payment of dividends.

In this case, the motive for the creation of the subsidiary corporations was to fulfill a business need of the parent corporation for motor freight terminals, and to enable the newly created corporations to engage in an income producing activity. The motive for the distribution was to place all non-carrier corporations in a single group, with a common parent in order to accomplish the maximum concentration of financial strength with which to raise additional capital to enable the subsidiaries to construct the terminals needed by Mason & Dixon. The purpose of all transactions was immediate and germane to the continuation of all corporations. If any stockholder purpose was served, it was a normal purpose in that the corporations in which they owned interests were enabled to expand and to become more profitable.

In *Rafferty,* the consequence of the distribution was that the taxpayer was placed in a position to distribute earnings and profits away from or out of the business, because a sale of the real estate properties could be easily arranged in that the buildings were capable of multiple use. In this case, the terminals were "single-purpose facilities which required specialized equipment and construction." Moreover, the valid business purposes required that the properties be retained in order to augment the corporation's ability to obtain financing, and to enable them to continue and to eventually increase their income producing activities. A sale or liquidation would have impaired the continued operations of Mason & Dixon and its subsidiaries, and would have defeated the purpose of the distribution.

We conclude that these taxpayers are in substantially the same position today

as they were before the reorganization. None of the taxpayers have withdrawn or can withdraw any funds under the reorganization as it was planned and executed. In its simplest form, this reorganization constituted a mere realignment of the corporate structure whereby stocks previously owned by Mason & Dixon were transferred to Crown, both of which were owned by the appellants. The undisputed facts as found by the Tax Court place this reorganization within the ambit of § 355, and therefore, the judgment of the Tax Court is reversed, and the cause is remanded to the Tax Court with instructions to enter judgment for the taxpayers in terms consistent with this opinion.

McCREE, Circuit Judge (concurring in part and dissenting in part).

I agree with the decision of the majority to reverse the judgment of the Tax Court on the question whether the real estate subsidiaries were engaged in the active conduct of a trade or business for the five years preceding the spin-off. And, I agree that this result necessarily determines the second issue raised by appellee, *i. e.*, whether the controlled corporations and the distributing corporation were engaged in the active conduct of a trade or business after the spin-off.

However, I would remand on the question whether the transaction was used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporations. The fact that there may have been valid business reasons for the spin-off does not, in my opinion, necessarily foreclose a finding that the transaction was used as a "device" for distributing earnings and profits. There may have been other means of separating the real estate operations from the trucking operations that would not have resulted in placing the shareholders of the distributing corporation in a position to realize capital gains on the earnings and profits of the real estate subsidiaries by selling Crown stock while maintaining their interests in the

trucking companies. The Tax Court should be permitted to apply its expertise to this question. Moreover, a determination whether a transaction was used principally as a device in this context is a factual one: it entails finding an "ultimate fact" by making certain inferences from the "primary facts," *see* NLRB v. Hudson Motor Car Company, 128 F.2d 528, 532 (6th Cir. 1942), a reasoning process not to be undertaken initially by this court but by the Tax Court. Kisting v. Commissioner of Internal Revenue, 298 F.2d 264, 269 (8th Cir. 1962). Finally, I observe that the majority is deciding the "device" issue without the benefit of briefing and argument by appellee, who urged us to remand for determination of the issues not decided by the Tax Court should we reverse on the first issue. I believe this third issue to be sufficiently complex to justify, at the very least, affording appellee an opportunity to brief and argue it.