**NICHOLS–MORRIS CORPORATION,**
Plaintiff,

v.

**Robert E. MORRIS, Defendant.**

United States District Court
S. D. New York.

June 24, 1959.

Schreiber, Klein & Opton, New York City, Gabriel B. Schwartz, New York City, of counsel, for plaintiff.

Parker, Chapin & Flattau, New York City, Samuel M. Chapin, and Alvin M. Stein, New York City, of counsel, for defendant.

WEINFELD, District Judge.

■ This is an action by the plaintiff, a New York corporation, against its former President and Director,[1] charging him with breach of fiduciary duty. The basic charge is that the defendant, while still an officer of the plaintiff, induced the cancellation of a profitable sales distributorship enjoyed by plaintiff for thirteen years, which thereupon was awarded to a corporation controlled by the defendant.

Plaintiff was organized in April 1943 by the defendant, Robert E. Morris, and his then close friend, Max J. Bloch, to act as sales representative for manufacturers of factory equipment. Each purchased 50 per cent of the corporation's capital stock for $15,000.

The plaintiff, upon its formation, was designated by the W. H. Nichols Company as its sole distributor, on a national and world-wide basis, of milling machines manufactured by it and known in the trade as "Nichols Millers". For some years previously, the defendant had acted as the New England sales representative of W. H. Nichols Company, and it was largely because of the esteem in which he was held by officials of the latter company that plaintiff corporation was designated. As national sales representative, plaintiff served as the sales and credit department of the W. H. Nichols Company; appointed retail dealers throughout the United States; passed upon the credit to be extended to them; furnished them with technical assistance; carried on promotional and advertising campaigns; and generally did whatever was required to promote the sale of the machines.

Plaintiff continued to act in this capacity without interruption until May 4, 1956 when the Nichols Company terminated plaintiff's appointment as its national distributor. The Robert E. Morris Company, a corporation of which the defendant was President and controlling stockholder, was named as plaintiff's successor. The plaintiff charges that the loss of the national distributorship of "Nichols Millers" was induced by the defendant in breach of his duty to it and in violation of its rights. It also charges that the defendant, in furtherance of his design to displace the plaintiff, enticed one of its employees, who had been engaged specifically to further sales and to service local "Nichols Millers" dealers, to resign, and to enter into the employ of the Robert E. Morris Company.

Upon the organization of the plaintiff corporation, Morris was elected President and Bloch Vice-President; each was also elected a Director. They were the sole stockholders and both entered into employment agreements with the corporation. These did not restrict participation in the affairs of other corporations in which each was interested. Thus, Morris was permitted to continue his activities with the Robert E. Morris Company which, under appointment by the plaintiff, thereafter continued to function as the exclusive New England retail agency for "Nichols Millers". The plaintiff, as the national distributor of the product, received an overriding commission on all sales made by local or territorial agencies, including the Robert E. Morris Company.

The affairs of the plaintiff, at least as they touch upon issues presented by this case, fall into three periods. The first is from its incorporation in April 1943 through the first half of 1946. During this period it met with moderate success. In this initial stage, Bloch and the de-

---

1. Jurisdiction is based upon diverse citizenship. Since plaintiff is a New York corporation with its principal place of business here, the substantive law of New York governs.

fendant, although permitted by their respective employment contracts to serve other corporations in which they held interests, devoted substantially all their time to promoting plaintiff's welfare. The defendant, who was designated General Manager, was the contact man. He called upon local dealers; advised with them on technical matters; prepared promotional and advertising material and engaged in sales promotion. Bloch, who was designated the Sales and Export Manager, generally functioned as the inside man. Each attended Trade shows at which the "Nichols Millers" were exhibited.

During the second period, from the latter half of 1946 to the spring of 1949, the plaintiff operated at a loss or a nominal profit. Morris gave less of his time to plaintiff than previously; he divided his activities in 1946 and 1947 about equally between it and the Robert E. Morris Company. Early in 1949 the defendant sold to the plaintiff 140 shares of his stock at par value ($14,000) which were held as Treasury stock. He retained 10 shares of his original holdings. Some months before the sale of his stock, commencing in the latter part of 1948 and continuing until May 11, 1956, the defendant concentrated the major portion of his time and efforts on the affairs of the Robert E. Morris Company, and gave less time to plaintiff than in any previous period. As of April 1, 1949, he resigned as General Manager of plaintiff, but continued to serve as its President and Director, to which offices he was regularly elected until he resigned on May 11, 1956. The defendant, commencing in the early part of 1949, waived any compensation as an officer or director, or for any other services rendered by him.

The third chapter extends from 1950 to May 11, 1956. Beginning in 1950, the plaintiff's fortunes improved considerably, and its activities as national sales distributor for the "Nichols Millers" became increasingly profitable—much beyond the initial era of 1943 to 1946. This was also a prosperous period for the Robert E. Morris Company, which was the most successful of all the local dealers in "Nichols Millers". Bloch and Morris, during the era of 1950 to 1956, remained fast and close friends—at least, until the events hereinafter described commencing on February 6, 1956.

Following the defendant's resignation as General Manager in 1949, Bloch necessarily took on added functions and expanded his activities in managing the affairs of the plaintiff. However, Morris, who as already noted continued as President, was not without his duties. He was consulted on all major and basic problems pertaining to the plaintiff; he called on "Nichols Millers" local dealers; he represented the plaintiff on annual trips in the United States and abroad (while also acting for the Robert E. Morris Company, there being no incompatibility in such representation); he edited letters involving major policy considerations; he prepared advertising copy and promotional literature; he advised on personnel matters; he rendered technical advice and assistance.

Toward the end of 1955, it was decided that plaintiff's sales and field service contacts should be expanded. Through the defendant's efforts, the services of one John H. Bashforth, who had been with one firm for thirty-two years, were secured. It was intended that Bashforth would play an important role in plaintiff's affairs as a skilled sales and service engineer. The need for such a person had been stressed by the W. H. Nichols Company. Bashforth entered into the employ of the plaintiff on February 1, 1956, under a written contract.

On February 6, 1956, shortly after Bashforth's employment, the defendant advised Bloch that he desired to repurchase the 140 shares of Treasury stock at par value, the price at which he had sold them in 1949. Bloch did not take kindly to this proposal, since the book value of the outstanding shares greatly exceeded their par value. Morris, however, felt that his proposal was fair since he had given of his time and effort to the corporation and had remained as

President and Director, all without compensation, since the early part of 1949. Their first discussion was inconclusive. During the course of the conversation, Morris stated that he was principally responsible for plaintiff having the Nichols account, and that he had power to take the account from plaintiff. The defendant concedes that he intended a threat to take the account unless some agreement were reached.

Following the February 6th proposal, the relationship between Bloch and Morris was a guarded one, with attempts—not too successful—to resolve their differences. In the weeks that followed, the defendant taxed plaintiff for evading a decision. Impatient because of the delay, the defendant on March 27, 1956, sent Bloch a letter in which he summarized their business and personal relationship through the years, and pressed for a definite answer as to the repurchase of the stock. In general, the defendant emphasized his, and denigrated Bloch's contribution to the plaintiff. Before Bloch could reply and without his knowledge, Morris, on March 28 and 29, called on Hart Nichols, a principal executive officer of the Nichols Company. He showed Nichols his March 27th letter to Bloch, and discussed its contents with him. Nichols was on terms of close friendship with both men, but it is stating the fact that he regarded Morris as the one most responsible for plaintiff's success in the sale of "Nichols Millers". At the two-day meeting, Morris complained of Bloch's failure to come to terms on the resale of the stock; he disparaged Bloch's capacity to meet and fraternize with "Nichols Millers" dealers, and emphasized the importance of his own contacts with them. He underscored Bashforth's recent employment by plaintiff and the role he was expected to play with dealers in the servicing and sales of the "Nichols Millers" line, and that it was he, Morris, who had been responsible for Bashforth joining the plaintiff. Other matters of a kindred nature were presented by Morris. In sum, he undermined both plaintiff's and Bloch's position as effective forces for Nichols products without the benefit of his association.

There can be no doubt that the purpose of the defendant's call on Hart Nichols was to lay the groundwork for the transfer of the distributorship to him in the event he failed in his purpose to repurchase the stock.

The week following, Bloch called upon Hart Nichols and suggested that the defendant was using his friendship with the latter to enforce his demands with respect to the stock. Nichols, in an effort to compose the differences between the two erstwhile friends, pointed out that they had made a well-balanced team. While Nichols testified that at the conferences on March 28 and March 29, Morris did not specifically say he was prepared to set up his own organization in the event the parties failed to reach an accommodation, it was patent that this was clearly implied. Indeed thereafter and unbeknown to Bloch, the defendant subtly urged upon the Nichols Company that it terminate plaintiff's designation as its distributor and instead appoint him.

On April 24, when he was convinced that no agreement would be forthcoming, Morris wrote to Hart Nichols, making a blunt appeal for the distributorship. In this letter Morris again depreciated plaintiff's capacity successfully to continue the distributorship without him; he reiterated Bloch's shortcomings as an individual in sales promotion, and concluded: " * * * in the light of the above facts, * * * the best interests of W. H. Nichols Company would be served by my assuming sole responsibility for NICHOLS Millers distribution, supported by John Bashforth and the REMCO [Robert E. Morris Company] organization". Bashforth at this time was still an employee of plaintiff and under contract to it.

The letter of April 24 included copies of recriminatory letters which Bloch and Morris had exchanged after an abortive meeting with the attorney for the plain-

tiff corporation in further efforts to negotiate a satisfactory compromise. Soon thereafter, on May 4 the Nichols Company took action. It advised the plaintiff and the two individuals, as its principal officers, that the impasse appeared to call for the severance of Morris from the plaintiff corporation and that the Nichols Company intended to make other arrangements for the distribution of its "Nichols Millers".

Within a week, on May 11, 1956, the defendant submitted his resignation as President and Director of the plaintiff. On the same day, John Bashforth renewed previous requests to the plaintiff to be relieved of his employment contract. Plaintiff, given little practical choice, reluctantly acquiesced and on June 16 Bashforth entered the employ of the defendant. Bashforth's requests to withdraw from plaintiff's service were inspired by defendant commencing in April when he had embarked upon his campaign to undermine plaintiff's position with the Nichols Company.

A few days after Morris resigned, he was advised by W. H. Nichols Company that he would be appointed to succeed the plaintiff as the national distributor of "Nichols Millers". Thereafter the termination of plaintiff's designation was made effective as of October 31, 1956. The Robert E. Morris Company's appointment as plaintiff's successor went into effect the very next day. Thus ended thirteen years' representation by plaintiff as national distributor of "Nichols Millers".

■ The question presented is whether the defendant is liable to the plaintiff for the loss of this account. As the plaintiff's President and one of its directors, the defendant was under a fiduciary duty to it. The nature of these duties is not open to debate. They are succinctly stated in several classic authorities in the Federal and State courts —Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; Irving Trust Co. v. Deutsch, 2 Cir., 73 F.2d 121, certiorari denied, Biddle v. Irving Trust Co., 294 U.S. 708–709, 55 S.Ct. 405, 79 L.Ed. 1243; Kavanaugh v. Kavanaugh Knitting Co., 226 N.Y. 185, 123 N.E. 148; Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1; Duane Jones Co. v. Burke, 306 N.Y. 172, 117 N.E.2d 237. They are not only the guideposts of the duty demanded of corporate fiduciaries, but all enunciate an uncompromising policy of rigid enforcement of that duty. The defendant, recognizing that the Courts have stood firm against any relaxation of the standard of duty, seeks to avert its force by disavowing that in fact he was a fiduciary. He urges that from 1949, when he resigned as General Manager, to May 11, 1956, when he resigned as President and Director, he was an officer and director in name only; that such services as he rendered during that period were performed, not on behalf of the plaintiff as its officer and director, but for his former friend, Bloch, individually, to give him the benefit of his, Morris', skill and his contacts with dealers in the trade. This contention rests upon the claim that beginning late in 1948 or early in 1949, his services to the plaintiff gradually decreased so that they were de minimis; that his annual re-election as Director and President (while still a stockholder) was a personal accommodation to Bloch when, upon the sale of Morris' stock, the latter became the majority stockholder and principal officer. In sum, his position is that since 1949 he did not exercise the duties of a corporate officer or director; that consequently he occupied no position of confidence or trust toward plaintiff and so was free of any fiduciary duty to it.

■ The classical restraints imposed by law upon directors or officers are not so easily shed. One who accepts, and continues in, office takes it with all its responsibilities and duties, and must measure up to its demands. Any other rule would result in erosion of the standard of loyalty imposed upon a corporate fiduciary. To suggest that one can, by disregard of his duty, immunize himself from fiduciary responsibility would undermine the strict code of trustee con-

duct the Courts have steadfastly enforced. But apart from this, the defendant's contention that he was a "sterile, captive"[2] director and officer of the plaintiff corporation finds no support in this record.

Undoubtedly after March 1949 the extent of the defendant's services had diminished, since he was devoting most of his time to the Robert E. Morris Company. However, he still continued to play a significant role in plaintiff's affairs, particularly with respect to policy and other important matters. The independent evidence of actual services performed after March 1949 abundantly establishes this and strong corroboration comes from the defendant himself. When negotiations for the repurchase of the Treasury stock appeared to be stalled, the defendant unburdened himself toward Bloch in the letter of March 27, 1956, already referred to, wherein among other matters he stated:

"Despite my voluntary waiver of compensation from N-M [Nichols-Morris] starting several years ago, I have continued to be intimately associated with the corporation as its titular head even though not its active manager. I have been consulted and brought in on every problem of major consequence * * *."

He stressed this role and his other functions in plaintiff's affairs when, in his letter of April 24 to the Nichols Company, he made his direct appeal for the distributorship. Finally, his present contention that he was but a figurehead in the plaintiff corporation is negatived by his repeated statements to the Nichols Company that he was not only a key figure in the plaintiff corporation but that he had always been strongly identified with "Nichols Millers" distribution in the minds of the various local dealers who had been licensed by the plaintiff to distribute their product. Upon all the evidence, the record compels rejection of defendant's assertion that since 1949 he was a "sterile" director, in consequence of which he was free from any fiduciary duty to the plaintiff.

Neither is there substance to the defendant's further contention that even if he were under a duty of loyalty to the plaintiff by reason of his office, it was ended on February 6, 1956, when he first proposed to Bloch the repurchase of the 140 shares of stock, with the intimation, which he now concedes was a veiled threat, that unless his demand were met he had the power to, and would, take the "Nichols Millers" account from the plaintiff. This was no more than a threat by a fiduciary to use his power to bring the beneficiary to terms. The defendant has ignored the fact that plaintiff is a legal entity to whom he owed a positive obligation of fair play and loyalty so long as he remained a Director and its President. He has sought to frame his legal duty only in terms of personal relationship to Bloch. His fiduciary obligation to the plaintiff did not end with the issuance of an ultimatum to Bloch. When the defendant's proposal of February 6 was not acted upon at once but deferred for further consideration, the defendant did not resign as an official of the plaintiff nor did he withdraw from its affairs; instead he continued his efforts to achieve his purpose to reacquire the stock. In addition, from that day to his resignation on May 11, 1956, while Bloch and he were engaged in maneuvers on the stock situation, Morris entered upon a campaign to cause the cancellation of plaintiff's distributorship in his favor in the event he failed to reacquire the stock. In effect, he was playing both ends to the middle. If he obtained the stock, he and the distributorship would have remained with the plaintiff; if he could not have the stock, he was determined to have the distributorship.[3] Under

2. Cf. Fine v. Loew, Sup.Ct., Spec.T., 7 Misc.2d 245, 159 N.Y.S.2d 318.

3. These and other facts at once distinguish the instant case from Washer v. Seager, 1st Dept., 272 App.Div. 297, 71 N.Y.S.2d 46, affirmed without opinion, 297 N.Y. 918, 79 N.E.2d 745, and other cases relied upon by the defendant.

these circumstances, to suggest—as the defendant does—that his demand on February 6, 1956, relieved him of his duty to the plaintiff is to reward his own misconduct.

■■ The duty of loyalty owed by the defendant to the plaintiff continued as long as he remained its Director and President. He could not shed his responsibilities at will. An ultimatum is not a substitute for a proper and legal resignation as an officer or director, nor does it, as the defendant also urges, effect a dissolution of obligation to the plaintiff. It is true that no formal written notice of resignation is required, but to terminate the fiduciary relationship which flows from office in a corporation, it must appear unequivocally that, in fact, a complete withdrawal has been effected. Here the contrary appears; the defendant did not resign until May 11, 1956. Instead, from shortly after February 6 to the date of resignation, he engaged in activities which undermined plaintiff's position with the Nichols Company with the eventual result that the distributorship was cancelled in his favor.

It is not without significance that the defendant's resignation was not submitted until a week after the Nichols Company advised the plaintiff of the termination of the distributorship. The defendant's conduct, in inducing its cancellation, was antagonistic to plaintiff's interest, an interest the defendant was under a duty to serve with fidelity. His dereliction of duty is underscored by his effort, which also eventually succeeded, to induce Bashforth to leave plaintiff's employ to serve the defendant's organization in the event it obtained the distributorship. Bashforth had been hired specially by the plaintiff, acting upon a suggestion from the Nichols Company that there was need to bolster the servicing of "Nichols Millers" dealers. He was to play an important role on behalf of the plaintiff in this field. When the defendant, on April 24, 1956, directly solicited the distributorship from the Nichols Company, one of the arguments he advanced was that "[Bloch] will henceforth be operating without my assistance or John Bashforth's". Bashforth was then an employee of the plaintiff and under contract to it, but under the influence of the defendant, his close friend, he requested that he be relieved of his contract. When plaintiff reluctantly yielded, Bashforth immediately entered the defendant's employ.

On the entire record it is clear that at the very time the defendant was under a duty of fidelity to the plaintiff, he engaged in acts which at once were destructive of plaintiff's interests and beneficial to his. This breach of fiduciary obligation resulted in the loss to the plaintiff of the distributorship and its probable continuance, and plaintiff is entitled to resulting damages.

■■ It is hardly necessary to add that the circumstance that the defendant did not receive a salary or compensation, which he voluntarily waived following his resignation as General Manager, did not relieve him of his obligation to the plaintiff. Indeed, directors and officers of a corporation serve without compensation unless special provision is made therefor.[4] To accept the position suggested by the defendant on this aspect of the case would mean that a fiduciary's loyalty is measured by the rate of compensation. Loyalty is absolute and not a matter of dollars.

We next turn to the question of damages. The plaintiff urges that it is entitled to the capitalized value of the national distributorship of "Nichols Millers" on November 1, 1956, the date of its termination. The claim is based not only on the fact that since 1950 the distributorship yielded annual net profits but also upon the prospect of its continuance for an indefinite period. Plaintiff's expert witness gave it as his opinion, based upon a five-year average annual net profit, after taxes, of $27,000 attributable to the distributorship, that

4. Fox v. Arctic Placer Mining & Milling Co., 229 N.Y. 124, 128 N.E. 154.

the capitalized value of the distributorship as of November 1, 1956, was more than $250,000. Plaintiff asks that this sum be awarded to it as damages for the loss of the account.

 The claim is utterly unrealistic and bears no reasonable relationship to the damages suffered by plaintiff nor to the factual situation touching upon the distributorship. The legal damage for which liability is imposed is that which directly resulted from the wrong done to the plaintiff, and the amount awarded must rest upon evidence legitimately tending to support it.[5]

Several factors compel rejection of the plaintiff's extravagant estimate of damages. First, the plaintiff's expert, in giving his opinion as to the value of the distributorship, applied a capitalization rate of ten times the average net earnings derived from the distributorship. Thus, the validity of his conclusion rests upon the correctness of the earnings base (assuming arguendo that the capitalization method normally used to determine the good will value of a going business is applicable in this instance). The domestic "Nichols Miller" agency was but one of a number of plaintiff's accounts. Plaintiff was also the foreign distributor for that product; in addition it was the exclusive sales agency for other and unrelated products. It did not keep separate books of account for its multiple activities and no breakdown of income and expense according to the separate activities was reflected upon its records. In order to determine the average net profits allegedly attributable to the national "Nichols Millers" distributorship, plaintiff's accountant allocated income and expenses to the separate corporate activities. Income for specific activities was capable of fairly precise determination, but this was not so as to the common expense of operation, which included executive, clerical and sales salaries, travel, advertising, legal, accounting and other expenditures. A schedule, which allocated income and expenses according to the separate categories of plaintiff's activities, was prepared by plaintiff's accountant. The schedule was designed for trial purposes to lay the basis of plaintiff's claim for damages and in the accountant's own words aimed at getting a "pretty good result".

The apportionment of expenses reflected the accountant's judgment of what the charge should be to a particular segment of business. It was purely theoretical. One illustration will suffice. For the year ending March 31, 1955, the plaintiff's total gross income from all its activities was $131,636. Of this sum, $82,941 was derived from the national "Nichols Miller" distributorship, and $48,695 from all other activities. Thus, the percentage of total gross income attributable to the national distributorship was 63 per cent. Notwithstanding, the principal executive salary was apportioned equally between the distributorship and the combined other sources of income. This arbitrary allocation was applied even more radically in other instances. Thus, in 1954, when the gross income of "Nichols Millers" from national sales was $125,674 and that from the foreign and miscellaneous business was $22,460, again the executive salary was apportioned on a fifty-fifty basis. Similar and even more egregious disproportions appear throughout the schedule.

Upon the trial, the Court expressed its doubt as to the validity of the allocations made by the accountant. Many of them were based on information furnished by Bloch, who submitted to the accountant an estimate of the time spent by executives and others on the various activities of the plaintiff and on behalf of another corporation.[6] The accountant conceded that he gave no weight to the factor of the actual gross income which plaintiff

5. Cf. Von Au v. Magenheimer, 2d Dep't, 126 App.Div. 257, 110 N.Y.S. 629, affirmed without opinion, 196 N.Y. 510, 89 N.E. 1114.

6. Bloch was the controlling stockholder and executive officer of the Austin Industrial Corporation which shared with the plaintiff some of the expenses of common operation.

derived from the "Nichols Miller" domestic business.

The Court is fully convinced that a disproportionate and heavier share of expenses was charged to the foreign and other pursuits of the plaintiff than was warranted and, in consequence, this resulted in a severe underestimation of the expenses chargeable to the national "Nichols Miller" distributorship. The allocation obviously exaggerated the actual profits realized from that source.

■ Upon a review of all the evidence and an appraisal of the demeanor of the witnesses, the Court concludes that not only were the allocations applied by the witness unrealistic but they were clearly calculated to reflect a greater net profit due to the distributorship than was warranted by the facts. In end result, the net profits were distorted and since these figures, prepared by the accountant, were in turn used by the plaintiff's expert in arriving at the capitalized value of the distributorship, it necessarily follows that his opinion is unreliable and unacceptable. The Court, as the trier of the fact, is not bound to accept the conclusion of the expert, resting as it does on an unsound premise.

■ But apart from the foregoing, other factors compel rejection of the plaintiff's estimate of its damages. It is recognized that it is entitled to recover as damages the amount of loss sustained by it including the opportunity for profit on the account which was diverted from it by defendant's conduct.[7] The extent of this deprivation must be determined. In assessing the damages, the nature and character of the particular business and all the circumstances must be taken into account.

The distributorship was not for a fixed term of years. It was cancellable by the Nichols Company upon notice. There was no assurance of its continuity. It

is true that until the occurrence of the events already described, W. H. Nichols Company appeared likely to continue the plaintiff as its national distributor of "Nichols Millers". It is equally true that this prospect of continuance—the corporate opportunity—would remain only as long as the Nichols Company was of the view that the plaintiff had the capacity to perform as it had in the past. This was a matter which rested in the sole judgment of the Nichols Company. The record demonstrates that in the judgment of its officials the plaintiff's ability to perform to their satisfaction was conditioned upon the continued association with plaintiff of Morris and Bloch; that as between the two, Morris was regarded as the more effective and essential in the representation of the Nichols interests.

Morris was under no contractual obligation to continue with the plaintiff. He was free to resign as its officer and director. Once he properly severed his relationship with the plaintiff, he was not restricted from entering into a competitive situation, so long as he did not breach his fiduciary obligation.

The Nichols Company was entirely free to make an independent decision in its own interests. When the break came between the two associates, it had the choice of continuing with the plaintiff, appointing the defendant in its place, or naming a new designee. But Morris, as we have seen, was barred from interfering with plaintiff's rights with respect to the distributorship, because he occupied a position of trust and confidence toward it which continued at least until May 11, 1956, the date of his resignation.[8] However, the restraints upon him were not perpetual. Had Morris bided his time after he and Bloch came to the parting of the ways, resigned, and acted within permissible legal limits, the

---

7. Cf. Duane Jones Co. v. Burke, 306 N.Y. 172, 192, 117 N.E.2d 237, 247.

8. Under certain conditions a fiduciary's duty may even extend beyond the date of resignation. Cf. Duane Jones Co. v.

Burke, 306 N.Y. 172, 189, 117 N.E. 2d 237, 245–246; Byrne v. Barrett, 268 N.Y. 199, 206, 197 N.E. 217, 218, 100 A.L.R. 680.

record justifies a finding that upon, or soon after, his disaffiliation from the plaintiff, the Nichols Company would have cancelled the distributorship and awarded it to Morris, or to a company with which he was associated, as best qualified to serve the Nichols' interests. The defendant's precipitate action, while bound by ties of loyalty to plaintiff, has cast him in judgment. While the law condemns him because his conduct fell below the standard imposed and inflexibly enforced by it, the defendant may be held liable to the plaintiff only for the damages occasioned by his conduct. Plaintiff may not receive recompense on any unrealistic basis—certainly not upon that advanced by it. To accept plaintiff's claim, which finds no support in the facts, in effect would overcapitalize a cancellable distributorship, one that in the normal hazards of business plaintiff would not have continued to enjoy once the defendant withdrew from it.

The Court is fully persuaded that even without the defendant's inducement the Nichols Company, following his resignation, in its own interests and acting upon its own independent judgment, would have cancelled the distributorship and awarded it to the defendant. The inference is warranted that this action would have occurred within a year of the defendant's resignation. Under these circumstances, one year's loss of profits (realistically evaluated), represents just and adequate compensation as damages to the plaintiff, which the Court fixes at $22,500. In so assessing the damages, the Court has adopted those figures which favor the plaintiff, based upon profits it realized in periods preceding the termination of the distributorship. The record makes it doubtful that in the short period of operation following the defendant's succession to the distributorship the profits realized from it on an annual basis equalled those of the plaintiff.[9] It is suggested that several factors account for this—the recession in the machine tool industry and expenditures in the initial period of operation for unusual and nonrecurring items.

The plaintiff also seeks damages because the defendant induced Bashforth to leave its employ while still under contract to it. All told, Bashforth, while engaged to perform an important task for the plaintiff, was in its service less than six months. During a substantial portion of this time, he was incapacitated because of illness. No substantial damage has been established by plaintiff, but the defendant's action requires the imposition of some damages, which are fixed at $1,000. The plaintiff was put to trouble and expense, first in securing Bashforth's services, and later in replacing him.

The request for punitive damages must fail. The record establishes that the defendant was originally responsible for the award of the account by the Nichols Company to plaintiff and believed in good faith that he had the right to solicit it in his own interest when Bloch and he failed to reach an agreement. His action was misguided and ill-advised, but it does not necessarily mean that it was malevolent. The evidence does not justify the imposition of punitive damages.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

Submit judgment accordingly.

9. According to the records of the defendant's sales company, in the twelve-month period from January to December 31, 1957, its profits before taxes amounted to $28,825. However, plaintiff's accountant, by adjustments based upon his allocation method which the Court has rejected as unreliable, has estimated the profit attributable to the "Nichols Miller" distributorship in that period at $42,397 before taxes.