Henry Epstein, J.
This is an action by an aggrieved stockholder to recover on behalf of the corporation the property and *798 assets of said corporation, which it is alleged were unlawfully and fraudulently liquidated.
The complaint in its original form contained two causes of action; the first was an individual action at law for damages caused to plaintiff’s investment in Clermont Cravat Company, Inc., by means of an allegedly fraudulent liquidation of that corporation. The first cause of action was dismissed at Special Term (Nathan, J.) and thereafter reversed on the law by the Appellate Division (6 A D 2d 263); the Court of Appeals reversed the order of the Appellate Division (6 N Y 2d 867) and thereby reinstated the order of Special Term dismissing the first cause of action. The trial had herein was confined to the second or derivative cause of action.
Plaintiff corporation, Clermont Cravat Co., Inc., (hereinafter “ Clermont ”) was organized in 1922. At the time of its organization plaintiff Harry Greenfield was a 50% stockholder as was a Mr. Schwartz.
In 1922 defendant Harry B. Denner was an insurance agent and personal friend of Greenfield. About 1935 Denner was called upon by Greenfield to advise him on various aspects of the business. “ Clermont ” at that time operated retail tie stores in addition to its manufacturing business. Denner managed one of the stores and shared in the profits. He continued his activities with “ Clermont ” as a business adviser and part-time employee until 1939 when he became a stockholder with the purchase of one third of the outstanding stock.
•The defendant Sidney Nitchun joined “ Clermont” in 1933 shortly after he left college. He started as a salesman and throughout the balance of “ Clermont’s ” existence he was active in that capacity. In 1947 Schwartz withdrew from ‘ ‘ Clermont ” and his stock was sold by the corporation to the remaining stockholders plus Nitchun, so that the percentage of stock ownership was as follows-: Greenfield — 40%, Denner — 40% and Nitchun — 10% (Nitchun also had an option to purchase the remaining 10% out of his earnings).
The activities of “ Clermont ” were divided as follows: Greenfield generally directed the factory operation; Denner took care of the office work and serviced the Haband account; Nitchun was a salesman for all accounts except the Haband account.
The principal account of fl Clermont ” was the Haband account As long as Haband continued its active tie business as a mail order house, “ Clermont ” was assured of a substantial income. However, while Haband was originally solely interested in ties, it later expanded its activities into other fields *799 with a consequent diminishing spotlight on ties. The expansion of Haband had a reverse effect on “ Clermont” and the books of the company show a steady decline in sales. The sales to Haband had fallen from $1,276,798 in 1950 to $610,219 in 1956 and even then they constituted in excess of 50% of “ Clermont’s ” sales. Various witnesses, active in the tie industry, testified to a general slump in tie sales due principally to the advent of the sport shirt era. Stanley Grossman and Irving Mehler were the sons-in-law respectively of' Greenfield and Denner. They were employees of “ Clermont ” and their salaries were in part contributed by their fathers-in-law deducting a portion of their own respective incomes.
In 1951 and again in 1954, Nitchun sought to increase his compensation and on each occasion, Greenfield sold him an additional 5% of his stock. About June or July of 1956 the three stockholders were discussing business matters in the company office when once again Nitchun expressed his dissatisfaction with his income and sought increased stock ownership. This time Greenfield refused to sell any more stock and Denner asked that his stock be bought up because he desired to retire from the business. A general disagreement and misunderstanding of each other’s position ensued and the talk of liquidation was triggered. Greenfield considered the corporation as his personal business and was deeply hurt that Nitchun and Denner should even consider leaving the corporation, let alone discuss its liquidation. He became adamant that “ Clermont ” continue and he sought to prevent any breakup of the business entity. Denner offered to sell his stock to Greenfield at $20 a share less than book value or buy Greenfield’s stock at book value so that he could liquidate the business. These offers were refused; Denner and Nitchun proceeded to achieve liquidation and sent a notice of meeting of the stockholders and directors to consider the liquidation and dissolution of “ Clermont ”. On August 23, 1956 a meeting was held pursuant to the above notice and at this meeting Greenfield asked for a week’s delay to permit him to obtain counsel. The meeting was adjourned until August 30, 1956 and on that date, in the absence of Greenfield, the stockholders voted to dissolve “Clermont” (Denner and Nitchun now owning 70% of the outstanding stock).
Under the direction of Denner and over the objection of Greenfield “ Clermont ” was liquidated. A public auction was held after having been duly advertised. On January 10, 1957 Denner sent a liquidating dividend check to Greenfield for $90,000. Greenfield returned it to the corporation. On February 11,1957 another liquidating check for $15,000 was sent to Green *800 field and on May 9, 1957 a final cheek in the sum. of $6,000 was disbursed. On each of the latter two occasions, Greenfield returned the check. In addition to these checks Greenfield received 30% of the stock of Better-Bows, Inc., a corporation in which “ Clermont ” held a 50% interest.
“ Clermont’s ” pension fund entitled Greenfield further to $40,235.78 and a check in this amount was sent to Greenfield and deposited by him after an unsuccessful attempt to have such deposit considered “ without prejudice ”.
After the liquidation had been completed Denner retired from business and presently resides in Florida. Nitchun, however, desiring to remain in the tie industry, sought to find a new association through contacts made while a member of “ Clermont ”. Nitchun and one Meyer A. Berkowitz created a new corporation known as Mason Neckwear Co., Inc., (hereinafter called “ Mason ”). This new corporation, seeking a factory to manufacture ties, was unsuccessful in its attempt to locate at several buildings in the area generally occupied by tie manufacturers. Finally, it leased space in the building formerly occupied by “Clermont”. “Mason” was set to occupy the actual space of “ Clermont ” but because of objections from Greenfield and threatened legal action it selected space on a different floor.
Meyer Berkowitz was well known to Greenfield — the source of their friendship was the Haiband account which had been serviced by both Berkowitz and “ Clermont ”. Max Haber-nickel, president of Haband, testified that he dealt with Berkowitz because of their years of friendship. Habernickel also stated that he would not have dealt with “ Clermont ” if Denner were not there. .During the life of “ Clermont ”, there were times when Berkowitz needed materials to supply the Haband account and ‘ ‘ Clermont ” in a spirit of co-operation sold these materials to Berkowitz at cost. The newly formed “Mason” now services the Haband account and this is explained by Habernickel as a continued adjunct of his friendship with Berkowitz and in no way a recognition of Nitchun.
In the opinion of the Appellate Division on an appeal involving the pleadings in the instant case (6 A D 2d 263, 269) it was stated that “the majority stockholders had an unrestricted right to dissolve the corporation, provided no improper means were used in disposing of corporate assets, including good will.” Further on at page 270, Kavanaugh v. Kavanaugh Knitting Co. (226 N. Y. 185) is cited as “ authority for an action in equity by a member of the corporation to restrain illegal acts planned by faithless directors of the corporation, the illegality stemming from the design to injure the minority investment.”
*801 The facts in the Kavanaugh case are somewhat similar to those of the instant case. The dissolution in the Kavanaugh case was pursuant to the provisions of section 221 of the General Corporation Law wherein a majority of the board of directors of a corporation, other than a moneyed or" railroad corporation might adopt a resolution that it is advisable to dissolve the corporation. Section 221 of the General Corporation Law was repealed shortly after the Kavanaugh case and the statutory authority presently relied upon by defendants is section 105 of the Stock Corporation Law which was based on the former section 221 of the General Corporation Law. Section 105 has eliminated any reference to advisable dissolution and permits the voluntary dissolution upon the approval of the holders of two thirds of the outstanding shares of the corporation.
The meaning and effect of the word advisable was clearly defined in Kavanaugh (supra), as were the duties and responsibilities of directors in their relation to stockholders. The “ conscientious fairness, morality, honesty of purpose, which the law imposes as the guide for those who are under the fiduciary obligations and responsibilities’* are the same today as when the Kavanaugh case was decided. A distinction lies only in the use of the word advisable.
Conceding that advisable dissolution is a stricter limitation upon the corporate fiduciary than the present state of the statute, nevertheless the result, applying the instant facts, would be no different under either section. As already developed above, the stockholders reached a point where they were no longer interested in working together. Denner sought retirement and has in effect done just that. Greenfield reached the stage where he enjoyed the fruits of the business but was no longer able to actively participate to a degree wherein he could contribute to the management or advancement of the corporation. Nitchun was active and interested but felt that his interest and activity should be rewarded with a larger share of the profits. This was impossible under the stock division as it existed at the time dissolution was proposed. Business was falling off, the tie industry was depressed.
There is no evidence in this case which warrants it being considered as parallel to Duane Jones Co. v. Burke (306 N. Y. 172) or to Nichols-Morris Corp. v. Morris (174 F. Supp. 691 [1959]). Fiduciary responsibilities do not require holders of majority stock sufficient to command liquidation to sacrifice or jeopardize the security of their investment simply because the minority stockholder so insists. This, in substance, is what plaintiff’s counsel urges and this neither the testimony nor the credibility *802 of the witnesses warrants. The stubborn attitude of plaintiff Greenfield that this was “ Ms business ” and that he alone could determine its continuance, even to failure, cannot be transformed into a justification for such minority dictating to the majority stockholders.
Nitchun’s association with Berkowitz does not indicate any wrongdoing on Nitchun’s part. The withdrawal from “ Clermont ” was not in the furtherance of any conspiracy or generated by malice. Neither was there any negative covenant preventing Nitchun from engaging in the same business after the liquidation of “ Clermont ”. (Washer v. Seager, 272 App. Div. 297, affd. 297 N. Y. 918.)
Duane Jones Co, v. Burke (306 N. Y. 172, supra) cited by plaintiff is not in point. The factual history of this case does not permit the conclusion of the Duane ease. Plaintiff’s brief argues that the transfer of the Haband account to “ Mason ” by defendants Denner and Nitchun was in furtherance of the conspiracy to liquidate “ Clermont ”. The evidence is to the contrary. Berkowitz, a 50% stockholder in “Mason”, had supplied Haband’s account in an amount equal to “ Clermont ” and for a similar period. As indicated above, Max Habernickel, president of Haband, testified in his examination before trial that he gave the account to “ Mason ” because of his friendship for Berkowitz, and for no other reason (Washer v. Seager, 272 App. Div. 297, affd. 297 N. Y. 918, supra). He further testified that if “ Clermont ” had continued to do business without Denner they would not have had the Haband account.
The employment of some of “ Clermont’s ” employees by “ Mason ” is adequately explained by Edmond Gottesman, a union representative. It has been the policy of the union in cases of business failures to bring pressure upon new entities to accept the employees who had lost their jobs. There is nothing in the record to indicate that the defendants solicited such employees prior to the dissolution of “ Clermont ” (Joan Iris Corp. v. Lafer, 5 A D 2d 767; A. S. Rampell, Inc., v. Hyster Co., 3 N Y 2d 369).
The individual plaintiff cannot question alleged “ wrongs ” done to the corporation by means of a derivative suit where he himself has participated in the benefits of the “ wrong ” alleged. Greenfield accepted the proceeds of a pension and retirement fund as part of the liquidation procedure and is now estopped from questioning alleged wrongs done to the corporation (Rothschild v. Title Guar, & Trust Co., 204 N. Y. 458, 464; Diamond v. Diamond, 307 N. Y. 263; 3 Williston, Contracts [rev. ed.], § 684, p. 1971). The facts, however, are quite con *803 trary to plaintiff’s contentions that he was the victim of any conspiracy; or that any wrong was done to the corporation by its liquidation while still able to distribute substantial amounts to the stockholders. Plaintiff has failed to sustain the burden of proof by any preponderance of believable evidence. Motion to dismiss complaint granted. Judgment for defendants with costs. All of plaintiff’s motions upon which judgment was reserved are now denied.