**ARIES VENTURES LIMITED and Raymond T. Mundy, Plaintiffs,**

v.

**AXA FINANCE S.A. and Oliver Roussel, Defendants.**

**No. 86 Civ. 4442 (WCC).**

United States District Court,
S.D. New York.

Jan. 18, 1990.

Krashes, Ross, Gess & Brown, Spring Valley, N.Y., for plaintiffs; Donald J. Ross, of counsel.

Golenbock, Eiseman, Assor, Bell & Perlmutter, New York City, for defendants; Jeffrey T. Golenbock, Barry S. Gold, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

This diversity action is presently before the Court on defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56(c) and defendants' motion to dismiss the claim against Axa Finance S.A. ("Axa Finance") pursuant to Fed.R.Civ.P. 12(b)(5) for improper service of process. For the reasons stated below, defendants' motion for summary judgment is granted in part and denied in part. Defendants' motion to dismiss for improper service is denied.

## BACKGROUND

Plaintiff Raymond T. Mundy is an attorney as well as president and joint owner of plaintiff Aries Ventures Limited ("Aries"). Defendant Axa Finance is a Swiss corporation with its principal place of business in Geneva, Switzerland; defendant Olivier Roussel is a French citizen residing in Paris.

The present action initially stems from Mundy's involvement with Acor Capital Corporation ("Acor"). Roussel and his family were Acor's principal shareholders and directors. In November 1980, Mundy met with Olivier Roussel, his brother Alain Roussel, and Efrim Pandeff, the president

of Axa Capital Corporation ("Axa Capital"),[1] to discuss the proposed acquisition by Acor of property located in DeQueen, Arkansas (the "Property"). The Property, consisting of a shoe manufacturing facility, was leased at the time to Tred–2, Inc. ("Tred–2"), a corporation of which Axa Finance was the major shareholder. Jean–Louis Fatio was Axa Finance's sole officer and director as of January 1, 1980 and Roussel was a shareholder until at least 1980.

At the November 1980 meeting, Roussel allegedly proposed that Acor would purchase the Property. Mundy was elected Acor's president by Roussel and his brother shortly after the November meeting, purportedly to carry out the transaction. An agreement was reached with the Economic Development Administration ("EDA") in February 1981, whereby Acor purchased liens and other security positions in the Property held by EDA.[2] The purchase was financed by Olivier Roussel and his brother, sister and mother, each of whom contributed 25% of the purchase price. Mundy allegedly performed various legal services in connection with the purchase from EDA.

Shortly after the agreement was reached with EDA, Roussel allegedly directed Mundy to dissolve Acor and sell Acor's interest in the Property to Axa Finance in exchange for Axa Finance's assumption of the debt incurred in the purchase. For reasons which are not entirely clear, the record owner of the Property interests following the sale was Axa Capital.[3] The parties have stipulated that Axa Finance held the Property for the benefit of the Roussel family.

After Acor's dissolution, Aries loaned various sums of money to Axa Capital, allegedly in reliance on Axa Capital's authority to act as Axa Finance's agent. In a letter dated January 11, 1984, Mundy wrote to Fatio detailing the amount of various loans Aries had made to Axa Capital. On April 30, 1985, plaintiffs requested reimbursement for moneys loaned and services rendered, which defendants refused to pay. In this action, plaintiffs seek payment of $147,500 in legal fees and approximately $64,000 in loans, plus interest, based on a variety of legal theories.

## DISCUSSION

### I. Standard for Summary Judgment

Defendants maintain that they are entitled to summary judgment on plaintiffs' claims against the defendants for legal services rendered by Mundy between December 1980 and April 1985 and for loans advanced by Aries during the same period.

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact." Fed.R. Civ.P. 56(c); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). It must establish that there is a "genuine issue for trial." *Id.* at 587, 106 S.Ct. at 1356. "In considering the motion, the court's responsibility is not to resolve

---

1. Axa Capital is a New York corporation which monitored and managed either some or all of Axa Finance's investments in the United States. Roussel, other members of his family and Pandeff were Axa Capital's shareholders. In an Opinion and Order dated October 12, 1988, this Court upheld the Magistrate's decision to refuse plaintiffs' "eleventh-hour" request to amend their complaint to include Acor and Axa Capital as additional defendants.

2. Because the debtor was in default, Acor could foreclose on the liens it purchased and gain ownership of the Property.

3. A bill of sale from Acor to Axa Capital was signed October 13, 1981. Acor took title to the Property on April 12, 1982, after foreclosure proceedings were concluded against the Property. Although Acor was dissolved on January 7, 1982, Axa Finance was purportedly not substituted as the real party in interest in order to conclude the foreclosure proceedings quickly.

disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight* 804 F.2d at 11. The inquiry under a motion for summary judgment is thus the same as that under a motion for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

## II. First and Second Causes of Action

In two identical causes of action, the first on behalf of Aries and the second on behalf of Mundy, two separate legal theories are alleged. Plaintiffs first allege a contract claim wherein defendants, either directly or through their agent, Axa Capital, contracted and agreed to pay Mundy for legal services rendered and to repay Aries the moneys loaned.[4] Second, plaintiffs claim that Roussel, through Axa Finance, controlled the activities and affairs of Axa Capital and Acor and is liable for their debts under the theory of piercing the corporate veil.[5]

### A. Contract Claims

Mundy alleges that he performed various legal services on behalf of defendants in connection with the Property. There is no written evidence, such as a retainer agreement, to show that Mundy was asked to perform legal services on behalf of either defendant. Mundy claims that he did not request a retainer agreement because he "knew and trusted" Roussel. Plaintiffs' Brief in Opposition to Defendants' Motion ("Plaintiffs' Brief") at 5.

■ Mundy nevertheless asserts that there is ample evidence of an agreement between Mundy and Roussel concerning legal services.[6] As evidence, Mundy points to Roussel's request that Mundy become president of Acor. Mundy Affidavit ¶¶ 6, 7. Mundy claims that he was not hired by Acor, which he alleges had insufficient funds to pay him, but by Roussel for Roussel's personal benefit. Mundy Affidavit ¶¶ 9, 10. Mundy maintains that he became Acor's president to assist Roussel in acquiring the Property in Acor's name.[7] Mundy also claims that Roussel or his brother asked him to perform legal work in connection with the dissolution of Acor. Mundy argues that Roussel is thus liable under an implied contract for payment which was formed by the rendition and acceptance of services, as one is not expected to "labor without hire." *See Fox v. Arctic Placer Mining & Mill Co.,* 229 N.Y. 124, 128, 128 N.E. 154 (1920).

■ Defendants respond that even if Roussel asked Mundy to become president

---

**4.** Specifically, Mundy claims that he is owed $52,500 for services provided in connection with the acquisition of the Property and Acor's dissolution, $25,000 for legal services provided between October 1982 and May 1984 and $70,000 for work performed in connection with a lawsuit brought against Axa Capital and Pandeff. The loans which appear to be in issue, approximately $64,000, were made to Axa Capital in 1983 and allegedly used to pay wages to employees of Tred–2 in order to prevent the assertion of liens against the Property.

**5.** Defendants argue that Axa Finance cannot be held liable under the theory of piercing the corporate veil because Axa Finance was not a shareholder of Acor or Axa Capital. However, it is clear from plaintiffs' complaint and brief that their argument under this theory is confined to Roussel. Thus, this Court need not address the accuracy of defendants' argument.

**6.** Contrary to defendants' assertion, Mundy's claim does not violate General Obligations Law § 5–701(a)2, which provides that a promise to answer for the debt of another must be in writing, as Mundy is claiming that Roussel agreed to be liable not for Acor's debts, but for his own.

**7.** Directors and officers of a corporation serve without compensation for performing the usual and ordinary duties of their offices, unless express provisions for compensation are made by statute, charter, by-laws or agreement. *Nichols–Morris Corp. v. Morris,* 174 F.Supp. 691 (S.D.N.Y.), *appeal dismissed,* 272 F.2d 586 (2d Cir. 1959); *Alexander v. Equitable Life Assur. Soc.,* 233 N.Y. 300, 135 N.E. 509 (1922). Thus, in order to recover under an implied contract for services rendered as an attorney, it must be shown that these services were rendered outside of the ordinary duties of president of a corporation. *See Fox,* 229 N.Y. at 128, 128 N.E. 154.

of Acor, he did not request Mundy to perform legal work in connection with the acquisition of the Property or the dissolution of Acor. Further, even if legal work was requested by Roussel, it was requested in Roussel's capacity as director of Acor and therefore Acor would be the proper entity to sue. Mundy has raised sufficient material issues of fact as to whether he was hired to perform legal services at the November meeting. Additionally, while defendants' assertion that a corporation can act only through its directors and officers is accurate, an individual director has no power to act on behalf of the corporation, absent board authorization to do so.[8] *See Harlem River Cons. Co-op v. Assoc. Groc.*, 408 F.Supp. 1251 (S.D.N.Y.1976). As there are material disputed facts with respect to claims of a contract between Mundy and Roussel in his individual capacity, summary judgment is denied on this theory of recovery as to legal services performed while Acor existed.

■ However, there are no disputed material facts concerning a contract directly between Mundy and defendants for legal services performed after Acor's dissolution.[9] In both his affidavit and brief, Mundy states that he was requested to act as attorney for Axa Capital and Pandeff in connection with a March 1984 action, brought by Security National Bank ("SNB") against Axa Capital and Pandeff personally, as guarantor of the loan, to foreclose its lien on the Property. Mundy states that he was requested to act as attorney by Pandeff, not by either defendant. Mundy Affidavit ¶ 22; Plaintiffs' Brief at 10. No evidence is provided that either Roussel or Axa Finance directly contracted with Mundy for legal representation in the SNB action and therefore, whether defendants are liable for contracts entered into by Axa Capital is more appropriately addressed in connection with the agency theories of the seventh and eighth causes of action.

■ The same rationale applies to Aries' allegations that defendants, either directly or indirectly, agreed to pay Aries for sums loaned to Axa Capital. There are no written loan agreements between Aries and either Roussel, Axa Finance or Axa Capital. Aries admits that Roussel and Axa Finance did not request that Aries loan the money and were not aware of the loans at the time they were made. Mundy Deposition at 138, 302. The evidence is clear that the loans were requested by Pandeff, president of Axa Capital, and used in connection with the Property. Like Mundy's claim for legal services after Acor's dissolution, Aries' contract claims are more appropriately addressed in connection with plaintiffs' seventh and eighth causes of action, which maintain that Roussel and Axa Finance are liable for the contracts entered into by Axa Capital by virtue of its agency relationship with Axa Finance.

### B. Piercing the Corporate Veil [10]

■ Plaintiffs argue that Roussel controlled both Acor and Axa Capital to the extent that their corporate veils should be pierced. It is a basic principle of corporate law that a shareholder is only liable to the extent of his investment. It is also well

---

**8.** Thus, Roussel may well have been acting in his individual capacity. Defendants do not argue that the November meeting at which Roussel allegedly retained Mundy as an attorney was a meeting of the Acor board, although both Roussel and his brother, who appear to be Acor's only directors at this time, were present. Nonetheless, it is possible that Alain Roussel, as the only other director of Acor, authorized Roussel to contract on Acor's behalf in this transaction.

**9.** Mundy alleges that Alain Roussel, Roussel's brother who is now deceased, asked Mundy in 1982 to provide legal services in connection with the foreclosure proceedings brought against the Property by Acor. Mundy states that he spoke about the status of the proceedings with both Alain Roussel and Fatio. Defendants claim that if such a request was made, it was made in 1981. In neither case, however, would there be liability on the part of either Olivier Roussel or Axa Finance.

**10.** Because material issues of fact exist as to the existence of contracts between plaintiffs and either Acor or Axa Capital, plaintiffs are entitled to argue that Roussel is liable for the debts of Acor and Axa Capital under a piercing the corporate veil theory.

settled that New York courts [11] are reluctant to disregard the corporate entity and pierce the corporate veil. *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594 (2d Cir.1989); *Puma Indus. Consulting, Inc. v. Daal Assoc., Inc.*, 808 F.2d 982 (2d Cir. 1987).

■ Courts will disregard the corporate form and impose liability on a shareholder when a shareholder has used control of a corporation to further his own, rather than the corporation's, business. *Dow Chemical Pacific, Ltd. v. Rascator Maritime S/A*, 782 F.2d 329, 342 (2d Cir.1986); *England Strohl/Denigris, Inc. v. Weiner*, 538 F.Supp. 612, 613 (S.D.N.Y.1982), *aff'd without opinion*, 740 F.2d 954 (2d Cir. 1984). Courts have established certain criteria to be considered in determining whether piercing the corporate veil is appropriate. These include: (1) the absence of corporate formalities which are part of normal corporate existence, i.e., the election of directors, keeping of corporate records; (2) inadequate capitalization; (3) personal use of corporate funds; and (4) perpetration of fraud through the corporate vehicle. *See Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50 (2d Cir.1984). The rule that allows courts to disregard the corporate form and pierce the corporate veil is not applied unless it would "accomplish justice or equity." *Brunswick Corp. v. Waxman*, 599 F.2d 34, 36 (2d Cir.1979).

#### 1. Acor

■ Plaintiffs have offered some evidence of Acor's disregard of corporate formalities.[12] The Property was purchased with money borrowed by the Roussels from Credit Suisse, a Swiss bank. Acor's board of directors never formally approved of Acor's borrowing money from the Roussel family to finance the acquisition of the Property. There is no documentation of the loan in Acor's records. Additionally, the Property was never reflected as an asset in Acor's financial statements or tax returns, which Mundy alleges were completed without his participation.[13]

Plaintiffs additionally argue that Roussel originally wanted Axa Finance to acquire the Property but was precluded from doing so because of Axa Finance's interest in Tred–2. Acor was used instead to avoid an EDA prohibition against selling the Property to acquirers associated with Tred–2 or Axa Capital. After Acor was dissolved, allegedly at Roussel's behest, the Property was held by Axa Finance for the benefit of the Roussel family. Thus, material issues of fact exist as to whether the transaction's purpose was for Roussel's personal benefit and whether Acor so disregarded corporate formalities that the corporate veil should be pierced.

■ Defendants further argue that even if Acor were Roussel's alter ego, piercing the corporate veil is inappropriate because Mundy was not an outside party, but president and a director of Acor, in

11. Neither party raised choice of law as an issue and both sides have applied New York law. Federal district courts apply the law of the state in which they sit, including that state's choice-of-law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). This Court agrees that New York law is properly applied in this case. Both Acor and Axa Capital, with whom plaintiffs had extensive dealings, were at all relevant times New York corporations and the alleged contracts at issue in this case were entered into in New York.

12. Mundy's fourth cause of action, against Roussel, that Roussel is liable for Acor's debt because Acor was merely a conduit and agent for Roussel and his family and because Acor's board did not formally approve the use of Roussel's personal funds is identical to plaintiffs' first two causes of action in that it asserts that Acor's corporate veil should be pierced and will be treated accordingly.

13. Plaintiffs also maintain that Acor was a "shell" corporation with no assets. However, the only specific factual evidence presented contradicts this assertion. Acor's 1980 Corporate Income Tax Return reflects assets of $618,224.88 at the beginning of the year. Plaintiffs allege that none of the corporations had economic substance apart from Roussel and his family. According to plaintiff, Acor, Axa Capital and Axa Finance were managed and operated as a single economic enterprise to further Roussel's own interests. Again, the record is barren of any specific evidence supporting this assertion.

which capacity he signed corporate documents and agreements and conducted Acor's day-to-day business. Mundy responds to this argument by claiming that he never exercised independent judgment in connection with Acor's affairs, but merely followed Roussel's instructions. That Mundy may have acted at Roussel's request does not absolve him of responsibility for his actions. Mundy also claims he was unaware of the true ownership of the Property until the stipulation of facts entered into in connection with this action. For the identical reasons discussed in connection with the eighth cause of action, this claim raises factual issues which preclude summary disposition.

One goal of piercing the corporate veil is to prevent the misleading of creditors. *See Arrow, Edelstein & Gross, P.C. v. Rosco Prod., Inc.*, 581 F.Supp. 520, 525 n. 20 (S.D.N.Y 1984); *see also Brunswick Corp.*, 599 F.2d at 36 (corporate veil not pierced when creditor aware it was dealing with a "corporate dummy"). Defendants argue that because Mundy cannot show that he was defrauded, he cannot pierce the corporate veil. While Mundy may or may not have been misled by Acor's actions, some courts have held that fraud is not a necessary prerequisite to piercing the corporate veil. *See Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 853 (2d Cir. 1985); *Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir 1980); *Brunswick Corp. v. Waxman*, 459 F.Supp. 1222, 1230, *aff'd*, 599 F.2d 34 (2d Cir.1979). The Court concludes that it is not essential that Mundy show he was defrauded. Whether it is equitable to allow Mundy to pierce Acor's corporate veil is a separate issue which cannot be determined until factual questions such as whether Mundy was aware of Roussel's intent ultimately to own the Property are resolved at trial.

### 2. Axa Capital

Plaintiffs have raised no material issues of fact in connection with their allegation that Axa Capital was Roussel's alter ego. Plaintiffs have offered no specific facts to support their assertion that assets and liabilities were freely shifted among Acor, Axa Finance and Axa Capital. Without supporting evidence, conclusory allegations are insufficient to create material issues of fact concerning Roussel's liability as Axa Capital's alter ego and thereby defeat summary judgment. *See Miracle Mile Assoc. v. City of Rochester*, 617 F.2d 18, 21 (2d Cir.1980); *SEC v. Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978).

Moreover, Mundy's deposition testimony bolsters defendants' assertion that Axa Capital was an entity independent from Axa Finance. For example, Mundy testified that he was aware of a conflict between Pandeff and either Roussel or Axa Finance concerning money owed to Pandeff and knew that they were negotiating a financial settlement and separation agreement since 1983.[14] Under such circumstances, Axa Capital can hardly be considered Roussel's alter ego. Summary judgment is therefore granted on that claim.

### III. Business Corporation Law Section 719(a)(3)

Mundy, in his third cause of action, further alleges Roussel's personal liability pursuant to section 719(a)(3) of the Business Corporation Law ("BCL"). Section 719 provides, in relevant part:

(a) Directors of a corporation who vote for or concur in any of the following corporate actions shall be jointly and severally liable to the corporation for the benefit of its creditors or shareholders, to the extent of any injury suffered by such persons, respectively, as a result of such action:

(3) The distribution of assets to shareholders after dissolution of the corporation without paying or adequately providing for all known liabilities of the corporation ...

---

**14.** A financial settlement was ultimately reached in April 1985, which apparently also terminated Roussel's interest in Axa Capital.

Mundy claims that Roussel, as a former director of Acor, is liable to Mundy because he voted for Acor's dissolution and distribution of its assets without first satisfying Acor's debt to Mundy.

Roussel contends that Mundy's claim must be rejected because Mundy lacks standing to assert a claim under this section. This Court agrees. Section 719(a)(3) specifically provides that only the corporation, and not an alleged creditor, can bring suit. The remedies provided for enforcement of a director's liability are given only to the corporation. *See Planned Consumer Marketing, Inc. v. Coats & Clark, Inc.,* 127 A.D.2d 355, 513 N.Y.S.2d 417 (1st Dep't 1987) (only corporation can sue under section 719(a)(3)), *aff'd,* 71 N.Y.2d 442, 527 N.Y.S.2d 185, 522 N.E.2d 30 (1988); *but see Fiorillo v. New York State Dep't of Envtl. Conservation,* 123 A.D.2d 151, 510 N.Y. S.2d 775 (3rd Dep't) (court allowed the assessment of a civil fine directly against the directors of a dissolved corporation under 719(a)(3) without discussion of that section's standing requirement), *appeal dismissed,* 70 N.Y.2d 641, 518 N.Y.S.2d 1031, 512 N.E.2d 557 (1987).

Mundy's reliance on *Rodgers v. Logan,* 121 A.D.2d 250, 503 N.Y.S.2d 36 (1st Dep't 1986) to support his claim that he has standing under section 719(a)(3) is misplaced. In *Rodgers,* a creditor of a dissolved corporation was allowed to sue directly the former shareholders of the corporation for liabilities of the corporation. However, the creditors of the dissolved corporation in *Rodgers* did not sue pursuant to

section 719(a)(3).[15] Because Mundy, as a creditor of Acor, lacks standing to sue under section 719(a)(3), summary judgment is granted as to this claim.

## IV. Promissory Estoppel

■ Mundy's fifth cause of action against Roussel is apparently based on a theory of promissory estoppel. Mundy claims to have performed services and incurred expenses on Acor's behalf with Roussel's knowledge and consent and for Roussel's sole benefit. He therefore maintains that Roussel is estopped from denying the existence of an agreement to pay Mundy's fees and expenses. Roussel contends that even if he had knowledge of the services and fees, he is not personally liable for the debts of Acor unless the corporate veil is pierced. Mundy offered no evidence to support his claim that promissory estoppel is appropriate and failed to address this issue in his opposition to defendants' motion. Since no material issues of fact are raised, summary judgment is granted.

## V. Fraudulent Inducement

■ In his sixth cause of action, Mundy claims that Roussel committed fraud against Mundy by hiring him as president when Roussel knew that Acor did not have the resources to pay him. New York recognizes a cause of action for fraud in the inducement of a contract which is distinct from a claim that the defendant failed to perform the contractual obligations themselves. *See Triangle Underwriters, Inc. v. Honey–Well, Inc.,* 604 F.2d 737 (2d

---

**15.** The plaintiff's claim in *Rodgers* was based upon BCL § 1006(b) which provides in relevant part:

> The dissolution of a corporation shall not affect any remedy available to or against such corporation, its directors, officers or shareholders for any right or claim or any liability incurred before such dissolution
>
> . . . . .

In their briefs, both sides failed to address the portion of Mundy's third cause of action which alleged that Acor was liable under BCL sections 1006(a)(4) and (b). Although Acor is not a party to this suit, section 1006(b) provides that, "where it is impossible or futile to obtain [a] judgment [against a defunct corporation], the creditor can maintain an action directly against

the directors or shareholders ..." *Flute v. Rubel,* 682 F.Supp. 184, 187 (S.D.N.Y.1988) (quoting *Rodgers,* 121 A.D.2d at 253, 503 N.Y.S.2d 36). Where a corporation is dissolved and its assets liquidated without provisions made for liabilities, it is futile to require the creditor first to obtain an unexecuted judgment against the corporation before bringing suit against the directors. Mundy argues that such is the case here, as Acor made no arrangements to provide for liabilities not taken into account upon dissolution. A careful reading of defendants' briefs reveals that their summary judgment arguments were confined to section 719(a)(3); summary judgment on the section 1006(b) claim has not been sought and the Court expresses no view as to whether it would be appropriate.

Cir.1979); *Carlucci v. Owens–Corning Fiberglass Corp.*, 646 F.Supp. 1486 (E.D.N.Y 1986). Under New York law, in order to recover for common law fraudulent inducement, Mundy must be able to show: (1) misrepresentation of a material fact (2) falsity of that representation, (3) scienter, (4) reliance and (5) damages. *See Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir.1980) (elements of fraud), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981); *Anaconda–Ericsson, Inc. v. Am. Dist. Tel. Co.*, 101 F.R.D. 13, 15 (E.D.N.Y. 1984).

 Mundy's fraudulent inducement claim is clearly deficient for a number of reasons. First, in his deposition, Mundy testified that he never had any expectation of being paid for his services as Acor's president. Mundy Deposition at 36. Second, Mundy repeatedly claimed that he knew that Acor was a "no-asset" corporation and lacked the funds to pay him. Third, Mundy has not alleged specific facts tending to show that Roussel never intended to honor his representations and promises at the time the alleged oral agreement was executed. *See Croce v. Hirsch*, 1989 WL 66671, 1989 U.S.Dist. LEXIS 6594 (S.D. N.Y. Jun. 12, 1989). Therefore, summary judgment is granted on plaintiffs' sixth cause of action.

## V. Agency Theories

In the seventh cause of action, plaintiffs assert that Axa Finance is liable to plaintiffs because Pandeff and Axa Capital, as agents of Axa Finance, requested plaintiffs' services and loans between October 1, 1982 and March 31, 1985.

 Agency law binds principals to acts of their agents performed within the scope of their authority. *See British Am. & Eastern Co. v. Wirth Ltd.*, 592 F.2d 75 (2d Cir.1975). Thus, in order to hold Axa Finance liable as a principal, Pandeff and Axa Capital must have acted under authority granted by Axa Finance. Plaintiffs argue that Axa Capital acted under either (1) actual, (2) apparent, or (3) ratified authority granted by Axa Finance.

### A. Actual Authority

 Plaintiffs first argue that Pandeff, in his capacity as president of Axa Capital, acted under actual authority granted in an October 1, 1982 letter agreement (the "Agreement") between Axa Finance and Axa Capital, which stated in relevant part as follows:

> (1) Axa Capital shall be, and is hereby designated, the undersigned's exclusive agent to manage and operate the property with full power, authority and discretion to lease, mortgage, hypothecate or otherwise deal with the property ...

> (4) .... In addition the undersigned agrees to reimburse Axa Capital for all expenses relating to the property.

Defendants maintain that the Agreement did not authorize Axa Capital to borrow money from Aries or to retain Mundy as counsel. They argue that insofar as the Agreement authorized Axa Capital to borrow money, such authority was limited to mortgaging or hypothecating the Property, which Axa Capital failed to do with respect to loans from Aries.

While plaintiffs contend that the Agreement placed no limitation on Axa Capital's ability to borrow, this is untenable in light of the clear language of the Agreement and applicable principles of agency law. The specific authority granted in the Agreement to mortgage or hypothecate the property necessarily excludes the broader authority to borrow money without giving a security interest in the Property.[16] Further, under agency rules, authority to manage or operate a business does not include authority to borrow money, unless

---

16. As plaintiffs interpret the Agreement, Axa Capital would be authorized to borrow sums of money in connection with the operation of the Property without securing the loans, thereby creating liability on the part of Axa Finance, and ultimately Roussel, for amounts which could exceed the value of the Property itself. Clearly, authority to take such action is not provided in the Agreement, which specifically refers only to mortgaging or hypothecating the Property and contains no language giving Axa Capital the power to borrow money other than in connection with a mortgage or hypothecation.

the borrowing is a usual incident of the business. Restatement (Second) of Agency § 74.

 However, Pandeff asserts that despite the fact that he believed he had authority to borrow money under the Agreement, he "always consulted with the Roussels before acting on any matter." Pandeff Affidavit ¶ 19. Drawing reasonable inferences in favor of the non-moving party, Pandeff's statement may mean that the Roussels, on whose behalf Axa Finance entered into the Agreement with Axa Capital, authorized Pandeff to borrow money, even if such authority was not, as this Court has found, granted in the Agreement itself. While Pandeff's statement is suspect in that it fails to describe the time or content of any conversations with the Roussels and is unsupported by any written evidence, this Court's duty upon a summary judgment motion is only to determine if there are material issues of fact to be tried. Because a trier of fact could find Pandeff's testimony credible, summary judgment is denied on this portion of the seventh cause of action.

 Defendants also argue that the Agreement does not expressly grant Axa Capital the power to retain attorneys. However, the Agreement provides Axa Capital the power to "otherwise deal with the property" which arguably includes the ability to hire professionals to render services relating to the Property. Summary judgment is inappropriate when contract language is ambiguous. *See Bank of America Nat'l Trust & Sav. Assoc. v. Gillaizeau,* 766 F.2d 709, 715 (2d Cir.1985); *Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir.1985). Furthermore, plaintiffs point to specific evidence to support their interpretation of the agreement. A July 21, 1983 letter from Pandeff to Fatio requested payment of certain legal fees "as per [Fatio's] instructions." Golen-

bock Affidavit, Exhibit P. In the letter, Pandeff also stated that in the future, no legal expenses would be incurred without Fatio's prior authorization. Mundy and Pandeff both claim that Pandeff received prior consent to retain legal services after this date. Plaintiffs' Local Rule 3(g) Statement ¶ 33, Pandeff Affidavit ¶ 16. Fatio also stated that on various occasions, he sent money to Axa Capital for expenses such as legal fees. Fatio Deposition at 70.

Thus, assuming that Mundy can prove that he was retained as an attorney, material issues of fact exist as to whether the power granted in the Agreement included the authority to hire attorneys.[17]

### B. Apparent Authority

Plaintiffs further argue that Axa Capital had apparent authority to borrow money and request legal services. "Under agency principles, '[w]here a corporation clothes an officer or agent with apparent authority, which is reasonably relied upon [in] good faith by a third person, the corporation ... [is] estopped from denying such authority.'" *Shear v. National Rifle Ass'n of America,* 606 F.2d 1251, 1258 (D.C.Cir. 1979). This theory requires some act or omission by the principal, Axa Finance, justifying reliance by the third party on the agent's authority to act. *See In re Sterling Navigation Co.,* 444 F.Supp. 1043 (S.D.N.Y.1977).

 Essential to a finding of apparent authority is that the third party's belief that the agent had authority to act is a reasonable one.[18] Plaintiffs argue that because Axa Finance and Axa Capital had oral, as well as written, agreements concerning the management of Axa Finance's investments, plaintiffs had no way of knowing what authority Axa Finance orally agreed to delegate to Axa Capital. Mundy stated that he believed that Pandeff had

---

17. Because the agency agreement was executed on October 1, 1982, any recovery under this theory is limited to the $95,000 in services Mundy claims were performed after Acor was dissolved.

18. While Pandeff claims that he told Mundy that he had authority to borrow money under the management agreement, Pandeff Affidavit ¶ 19, it is clear that an agent cannot imbue himself with apparent authority. *See Consumers Subscription Center, Inc. v. Web Letter Co.,* 609 F.Supp. 1134 (E.D.N.Y.1985).

broad authority as Axa Finance's agent based on Mundy's ten-to-twelve-year experience dealing with the various entities involved in this case. Defendants respond that plaintiffs' belief was unreasonable and formed without the necessary inquiry into the scope of Axa Capital's actual authority. *See Ford v. Unity Hospital,* 32 N.Y.2d 464, 346 N.Y.S.2d 238, 299 N.E.2d 659 (1973) (third party must make necessary effort to discover scope of apparent authority). Whether plaintiffs acted reasonably under the circumstances in performing the legal services is a question of fact that precludes summary judgment on the issue of apparent authority. *See Peoples Westchester Sav. Bank v. Ganc,* 705 F.Supp. 164, 169 (WCC) (S.D.N.Y.1989); *Stanford v. Kuwait Airways Corp.,* 648 F.Supp. 1158, 1162 (S.D.N.Y.1989).

However, Aries' reliance on Axa Capital's apparent authority to borrow money was unreasonable as a matter of law and summary judgment is thus granted as to the existence of apparent authority with respect to the loans. Mundy stated that shortly after execution of the Agreement, he obtained a copy for himself. Therefore, Mundy had or should have had actual notice that Axa Capital was without authority to borrow money without giving a security interest in the Property. As Judge Friendly has observed,

> It is an accepted principle of the law of agency that a person with notice of a limitation which has been placed on an agent's authority cannot subject the principal to liability upon a transaction with the agent if he knows or should know that it is outside the scope of the agent's authority.

*Scientific Holding Co. v. Plessey, Inc.,* 510 F.Supp. 15, 24–25 (2d Cir.1974). While all situations do not require the third party to inquire of the principal whether an agent actually has authority to act, Aries, in light of its awareness of the Agreement, acted unreasonably in not contacting Axa Finance directly about Axa Capital's scope of authority. Aries has pointed to no act or omission by Axa Finance to support a finding of apparent authority. The delegation of actual authority to Axa Capital to engage in certain other transactions does not, without more, allow Aries to rest on Axa Capital's assertions that it had authority to borrow money. *See ITL, Inc. v. Aeronaves de Mexico, S.A.,* No. 82 Civ. 3170 (LBS) (S.D.N.Y. Apr. 7, 1983). Because Aries obtained a copy of the Agreement before making the loans, there are no material facts to support a finding of apparent authority with regard to the loans.

### C. Ratified Authority

Lastly, plaintiffs argue that any actions taken by Axa Capital without authority were ratified by Axa Finance. Ratification of an agent's acts taken without authority requires the principal's knowledge of all material facts of the transaction plus retention of the benefits. *National Am. Corp. v. Fed. Republic of Nigeria,* 448 F.Supp. 622, 646 (S.D.N.Y.1978), *aff'd,* 597 F.2d 314 (2d Cir.1979); *In re Sterling,* 444 F.Supp. at 1049.

Plaintiffs claim Axa Finance ratified Axa Capital's actions because it was aware that Mundy was performing legal services in connection with the SNB action and did not inform him that Axa Capital was not acting as its agent in hiring attorneys. Plaintiffs also claim that the loans were ratified when Pandeff and Mundy informed Axa Finance of the borrowing from Aries shortly after the loans were made and Axa Finance failed to repudiate the loans. Mundy Affidavit ¶ 6.

As to the legal fees, there are material issues of fact concerning whether Axa Finance ratified the retention of Mundy as an attorney. Axa Finance was aware of Mundy's involvement when Mundy informed Fatio of developments in the SNB action several times during the course of the action. Axa Finance and Roussel, who held the interest in the Property, benefitted from Mundy's services. Axa Finance argues that because Mundy did not state that he expected to be compensated by Axa Finance, it was unaware that reimbursement was expected from it. According to Axa Finance, when Mundy first billed defendants for his services in April 1985, defendants refused to pay Mundy, thereby

refusing to ratify Axa Capital's actions. Material issues of fact exist as to whether the content of the conversations was such that Axa Finance was aware that compensation was expected from it and not Axa Capital. Summary judgment is therefore denied.

■ As to the loans, Pandeff does not specifically describe the time or content of any conversation with either the Roussels or Axa Finance. In a May 7, 1984 telex to Axa Finance, specifically referring to the October 1, 1983 [sic] agreement, Pandeff requested immediate payment of a variety of expenses, including two loans made by Aries, which was then named Yamato Corporation. Plaintiffs' Appendix at 24. According to Mundy, the loans included the $63,000 at issue in this action. No evidence is provided regarding Axa Finance's response to Pandeff's letter. Mundy testified that he had no discussion of the loans with Roussel and that when he discussed them with Fatio, in August 1983, Fatio said not to make further loans. Mundy Deposition at 145. Mundy testified that they did not discuss whether Mundy would be reimbursed for loans previously made, but that Axa Finance did not deny liability for payment of the outstanding loans. Defendants argue that because Mundy did not request reimbursement at this time, Fatio did not know that Mundy expected to be paid, and that therefore there was nothing to repudiate. Material issues of fact exist as to whether Mundy provided Fatio with all material facts concerning the prior loans and whether the totality of the circumstances were such that Axa Finance can be held to have ratified Axa Capital's actions by failing to repudiate the benefits which accrued to Axa Finance as a result of the loans made on behalf of the Property.[19]

## VI. Liability of Agent of Undisclosed Principal

■ In their eighth cause of action, plaintiffs allege a double agency: that Axa Capital acted as an agent of Axa Finance, which acted as an agent for Roussel, the undisclosed principal. While Roussel is liable for Axa Finance's obligations if Axa Finance was his agent, regardless of whether Roussel's identity was disclosed, Axa Finance is liable for acts within the scope of its agency only if acting on behalf of an undisclosed principal. See Beck v. Suro Textiles, Ltd., 612 F.Supp. 1193 (S.D. N.Y.1985).

Plaintiffs allege that Roussel was the undisclosed principal of Axa Finance, thereby making Axa Finance liable for the loans and fees. Defendants do not argue that a principal-agent relationship did not exist between Roussel and Axa Finance, whereby Axa Finance held the Property for the Roussels, but insist that Mundy was fully aware that Roussel owned the Property. In his brief and affidavit, Mundy argues that he never knew that Roussel and his family held the primary interest in the Property, although he suspected it based on upon Roussel's interest and activities in matters relating to the Property. Plaintiffs' Brief at 28; Mundy Affidavit ¶¶ 14, 15. Defendants point to Mundy's deposition testimony that he always thought that he was working for the principals, whom he identified as the Roussels, and not the respective corporations.[20] Mundy Deposition at 48–50. This, however, is not a clear acknowledgment by Mundy that he knew the Roussels owned the Property. First, it is unclear what time period is concerned, as Mundy also worked for Axa Capital from 1974 to 1978. Second, Mundy may merely have been referring to Roussel's shareholder status with regard to either Axa Capital

---

**19.** It is clear, however, that any authority Axa Capital had to borrow money from Mundy was terminated in August 1983. In his deposition testimony, Mundy conceded that in their August 1983 conversation, Fatio specifically told Mundy not to make any further loans. Mundy Deposition at 144. Because Mundy knew that Axa Finance would not reimburse him for loans made after this date on their behalf, Mundy

cannot recover for any loans made after August 1983, to the extent they are at issue in this case.

**20.** Both Fatio and Roussel refused to disclose the owner of the Property in their depositions and did not admit that Roussel was the true owner of the Property until the May 17, 1988 stipulation of facts entered into in connection with this action.

or Axa Finance.[21] Defendants further contend that Mundy's claim of ignorance as to Roussel's ownership is unbelievable in light of Mundy's knowledge that the Roussel family provided the money to purchase the Property. However, the Second Circuit has repeatedly held that summary judgment is ordinarily inappropriate when intent or state of mind is in issue. *See e.g., Leberman v. John Blair & Co.,* 880 F.2d 1555, 1159–60 (2d Cir.1989); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. den.,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). Because the party opposing summary judgment must be given all favorable inferences in determining whether a question of fact exists and, although highly unlikely, it is possible that Mundy was unaware of the true ownership of the Property, summary judgment is denied as to whether Roussel was a disclosed principal.

*VII. Proper Service*

Defendants contend that the complaint must be dismissed against Axa Finance due to improper service of the summons and complaint. While plaintiffs do not contend that service was proper, they argue that the defendants have waived any objection to service of process. Under Fed.R.Civ.P. 12(h)(1), a defense of insufficiency of service of process is waived unless made by a pre-answer motion pursuant to Rule 12 or contained within a responsive pleading.

██ Defendants respond that they preserved this defense in their answer, in accordance with the requirements of Rule 12. This Court agrees. Axa Finance's first affirmative defense stated "[t]his Court lacks personal jurisdiction over the defendants." Since improper service of process results in a lack of jurisdiction over the person, *see Fish v. Bamby Bakers, Inc.,* 76 F.R.D. 511 (N.D.N.Y.1977), Axa Finance did not waive its objection to service of process.

██ Nonetheless, this Court will not dismiss the case, as dismissal is not invariably required when service of process is improper. "Motions under ... Rule 12(b)(5) differ from the other motions permitted by Rule 12(b) somewhat in that they offer the court a course of action other than simply dismissing the case when defendant's defense or objection is sustained." 5 Wright and Miller, *Federal Practice and Procedure* § 1354, at 584 (1969). The Court has "broad discretion to dismiss the action or to retain the case but quash the service that has been made on defendant." *Id.* at § 1354, p. 585 (citing, *inter alia, Lane, Ltd. v. Larus & Bros. Co.,* 136 F.Supp. 299 (S.D.N.Y.1955)); *see also, Picking v. Penn R.R. Corp.,* 151 F.2d 240 (3d Cir.1945).

██ Axa Finance clearly had actual notice of the present action. They have defended this action for three years. Because quashing service is the more appropriate remedy on these facts, the case will not be dismissed against Axa Finance and plaintiffs are directed to serve Axa Finance properly if they wish to provide this Court with jurisdiction over it.

### CONCLUSION

For the foregoing reasons, defendants' summary judgment motion is granted with respect to piercing Axa Capital's corporate veil, the BCL section 719(a)(3) claim, the promissory estoppel claim and the fraudulent inducement claim. Summary judgment is denied with respect to the existence of a contract between Mundy and Roussel for legal services in connection with the acquisition of the Property and Acor's dissolution, to piercing Acor's corporate veil and to the agency theories, except it is granted as to the claim that Axa Capital had apparent authority to borrow money. Service of process on Axa Finance is quashed, but the motion to dismiss as to Axa Finance is denied without prejudice to renewal if Axa Finance is not properly served within a reasonable time.

SO ORDERED.

---

**21.** Plaintiffs maintain that Roussel may have been a shareholder of Axa Finance in 1985.

Axa Finance does not keep lists of the names of its shareholders.